**Lupe ALONZO, Jim Alonzo, Joe Alonzo and Valentino Alonzo, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 5610.**

United States Court of Appeals
Tenth Circuit.

Sept. 25, 1957.

Lorenzo A. Chavez and Arturo G. Ortega, Albuquerque, N. M. (R. F. Deacon Arledge, Charles Driscoll, Albuquerque, N. M., Thurman Arnold, Walton Hamilton, William D. Rogers, Washington, D. C., and Melvin L. Robins, Albuquerque, N. M., were with them on the briefs), for appellants.

Fred W. Smith, Atty., Dept. of Justice, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., James A. Borland, U. S. Atty., Albuquerque, N. M., and Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., were with him on the brief), for appellee.

Santiago E. Campos, Asst. Atty. Gen., State of New Mexico (Fred M. Standley, Atty. Gen., State of New Mexico, was with him on the brief), amicus curiae.

Bryan G. Johnson, Albuquerque, N. M., Richard G. Cooper, Albuquerque, N. M., James T. Finlen, Butte, Mont., and Ralph D. Ray, New York City, filed a brief amicus curiae for Anaconda Copper Co.

Before BRATTON, Chief Judge, and PHILLIPS and BREITENSTEIN, Circuit Judges.

PHILLIPS, Circuit Judge.

On January 25, 1957, Lupe Alonzo, Jim Alonzo, Joe Alonzo, Valentino Alonzo and James Garcia commenced an action in the District Court of the Second Judicial District in and for the County of Valencia, State of New Mexico, against John Herndon, Anaconda Copper Mining Company, a corporation, the Pueblo of Laguna[1] and Clemente Lente, as governor of the Pueblo and in his individual capacity, and against Willie Creager, Joe Ross, Joe Marmon and Lee Marmon, as members of the Board of the Pueblo and in their individual capacities, seeking a writ of ejectment with respect to certain lands described in their complaint against the above-named defendants and damages for minerals alleged to have been wrongfully extracted from said lands by the above-named defendants. The state court action was numbered 8016 on the docket of the state court. Thereafter, on February 21, 1957, the United States, in its own behalf and in behalf of the Pueblo, commenced this action in the United States District Court for the District of New Mexico against the four Alonzos, James Garcia, John Herndon and the Anaconda Company (formerly Anaconda Copper Mining Company), a corporation, seeking a judgment quieting the title to certain of the lands embraced in the state court action and enjoining the plaintiffs in the state court action from prosecuting such action. From an order granting a preliminary injunction the Alonzos have appealed.

In its complaint the United States alleged that the title to certain of the lands embraced in the state court action was in the Pueblo, subject to restrictions against alienation, and that the title to certain other lands embraced in the state court action was in the United States.

1. Hereinafter referred to as the Pueblo.

Subsequent to the commencement of the instant action the plaintiffs in the state court action by amendment eliminated from that action lands owned by the United States in fee simple and lands claimed by the United States to be held by it in trust for the Pueblo, so that the state court action involved only lands owned by the Pueblo in fee simple and alleged to be subject to restrictions against alienation by the United States.

In its complaint the United States alleged that the Pueblo is a nation or tribe of Indians, recognized by the Congress of the United States as a dependent Indian community; that it occupies lands owned by the Pueblo in fee simple, but subject to restrictions imposed by the Federal law against alienation without the consent of the United States.[2]

In its complaint the United States further alleged that prior to the Treaty of Guadalupe Hidalgo, 9 Stat. 922, the Pueblo possessed a good and complete title to a tract of land located in the Territory of New Mexico known as the Paguate Grant or the Paguate Purchase; that the title of the Pueblo to the lands within the Paguate Purchase was confirmed by the Act of Congress of June 21, 1860, 12 Stat. 71, as Claim No. 30 on a list of claims recommended for confirmation by the Surveyor General, pursuant to the Act of Congress of July 22, 1854, 10 Stat. 308. That such title of the Pueblo to 75,406.27 acres of such lands was further confirmed by a patent, dated September 22, 1884, from the United States to the Pueblo.

That by the Act of June 7, 1924, 43 Stat. 636, 25 U.S.C.A. § 331 note, referred to as the Pueblo Lands Board Act, Congress created the Pueblo Lands Board and authorized it to investigate, determine and report "the lands within the exterior boundaries of any land granted or confirmed to the Pueblo Indians of New Mexico by any authority of the United States of America, or any prior sovereignty, or acquired by said Indians as a community by purchase or otherwise, title to which the said board shall find not to have been extinguished in accordance with the provisions of this Act, and the board shall not include in their report any claims of non-Indian claimants who, in the opinion of said board after investigation, hold and occupy such claims of which they have had adverse possession, in accordance with the provisions of section 4 of this Act." § 2.

That such Board investigated the claim of the Pueblo to the lands included in the Paguate Purchase and found there was a conflict between the Paguate Purchase and the Cubero Grant of 1833 as to a portion of the Paguate Purchase, as described in the patent of September 22, 1884, and further found that the title of the claimants to the Cubero Grant was superior to the claim of the Pueblo, as to the conflicting portion, and that such finding had the effect of extinguishing the claim of the Pueblo to such portion of the Paguate Purchase, amounting to 10,601.86 acres. That the Board further found there was a conflict between the Paguate Purchase and lands claimed by the owners of the Cebolleta Grant and certain private land claimants, and that the Board found that the claim of the Pueblo was superior to the title of such adverse claimants. That the Board further found there was a conflict between the Paguate Purchase and the lands claimed by the owners of the Baca Grant of 1769, and that the claim of the Pueblo was superior to the title of such adverse claimants. And that the Board determined that, except for the 10,601.86 acres found to be a part of the Cubero Grant, the Pueblo had a superior title to all of the lands within the Paguate Purchase described in the patent.

That pursuant to § 3 of the Pueblo Lands Board Act an action was instituted by the United States in the United States

---

2. Because of the amendment in the state court action, reference to the allegations in the complaint in the instant action to lands owned by the United States for the use of the Pueblo and lands owned by the United States in fee simple will be omitted

District Court for the District of New Mexico to quiet title of the Pueblo to the lands involved in the conflicts between the Paguate Purchase and the Cebolleta and Baca Grants, entitled United States v. Armijo, et al., No. 2080.

That on July 20, 1931, upon stipulation of the parties a final decree was entered in No. 2080, which quieted the title against the United States and the Pueblo in favor of the owners of the Cebolleta Grant and 72 private claimants to 10,-698.93 acres and quieted title in the Pueblo to 14,615.76 acres involved in the conflict.

That on November 7, 1931, a decree was entered in No. 2080, quieting the title against the United States and the Pueblo in favor of the claimants under the Baca Grant to 2,527.29 acres and quieting the title in the Pueblo to 3,-853.63 acres involved in the conflict between the Paguate Purchase and the Baca Grant.

That the Pueblo is the owner, entitled to the exclusive possession of 51,578.19 acres of the original Paguate Purchase, being the area embraced in such purchase, less the 10,601.86 acres found by the Pueblo Lands Board to be a part of the Cubero Grant, 10,698.93 acres adjudged to the owners of the Cebolleta Grant and private claimants and 2,527.29 acres adjudged to the owners of the Baca Grant in No. 2080.[3]

That the Pueblo granted to the Anaconda Company a permit to prospect for uranium and other minerals associated therewith, covering the lands owned by the Pueblo in the Paguate Purchase. That such permit was dated October 18, 1951, and was approved by the Department of Interior on November 6, 1951.

That the Pueblo, on March 27, 1952, granted to the Anaconda Company a mining lease for the extraction of urani-um and other minerals associated therewith from 799.09 acres of lands embraced in the Paguate Purchase;[4] that such lease was approved by the Department of Interior on May 7, 1952, and remains in full force and effect.

That prior to the treaty of Guadalupe Hidalgo and at all times since, the Pueblo has been and now is the owner in fee simple, subject to the restrictions on alienability imposed by the United States, of such 51,578.19 acres of the original Paguate Purchase and that during all of such time the Pueblo has been and now is in open, notorious, actual, exclusive, continuous and adverse possession of such lands. That the Alonzos and Garcia are claiming some individual right, title, or interest apart from their rights as members of the Pueblo, in such 51,578.19 acres of land, adverse to the Pueblo, which constitutes a cloud upon the title of the Pueblo.

That the Pueblo is the owner of 2,174.-332 acres of land acquired by purchase from the Board of Trustees of the Cebolleta Grant, which were conveyed to it by deed from such Board of Trustees to the Pueblo dated April 16, 1937. That such lands so purchased are a portion of the lands awarded to the Board of Trustees of the Cebolleta Grant by the judgment of July 20, 1931.

That the Pueblo is the owner of 2,-519.028 acres acquired by purchase from Cruz Baca and Tiburcia Baca, his wife, which were conveyed by the Bacas to the Pueblo by deed dated December 9, 1936. That the last-mentioned lands are the identical lands awarded to the claimants under the Baca Grant by the judgment of November 7, 1931.

That the Pueblo is the owner of 480 acres of land acquired by purchase from the Bacas, which were conveyed to the Pueblo by the Bacas by deed dated July 31, 1939. That the lands last-mentioned

3. The complaint sets out a particular description of such 51,578.19 acres of the lands excluded from the Paguate Purchase.

4. Such lands were particularly described in the complaint and were part of the lands, title to which was quieted in the Pueblo by judgment entered in No. 2080 Equity.

are not within the Paguate Purchase, but adjoin it on the north.

That the Pueblo is the owner and entitled to the exclusive possession of all the lands referred to in the last three preceding paragraphs. That the Alonzos and Garcia are claiming some individual right, title, or interest, apart from their rights as members of the Pueblo, in such lands, adverse to the Pueblo, which constitutes a cloud upon the title of the Pueblo to such lands.

That the Pueblo, prior to the Treaty of Guadalupe Hidalgo, had a good and complete title to lands now in the State of New Mexico, known as the El Rito, San Juan and Gigante Ranchos; that such Ranchos included, among others, lands situated in Township 10 North, Range 4 West, N.M.P.M. and Township 10 North, Range 5 West, N.M.P.M.[5] That the title of the Pueblo to the Ranchos lands was confirmed by Act of Congress of June 21, 1860, 12 Stat. 71, by patent dated September 22, 1884, from the United States to the Pueblo, and by the report of the Pueblo Lands Board made pursuant to the Act of June 7, 1924; that the Pueblo is the owner and entitled to the exclusive possession of such lands and beginning prior to the Treaty of Guadalupe Hidalgo and at all times since has been in the open, notorious, actual, exclusive, continuous and adverse possession of such lands; that the Alonzos and Garcia are claiming some individual right, title, or interest, apart from their rights as members of the Pueblo, in such lands, adverse to the Pueblo, which constitutes a cloud upon the title of the Pueblo.

As grounds for injunctive relief the United States alleged the commencement and pendency of the state court action, No. 8016, and the relief sought in such action; that the purpose and effect of such state court action is to challenge the title and possession of the United States and the Pueblo to the 51,578.-19 acres of the original Paguate Purchase and the lands acquired by purchase by the Pueblo, as above set out.

That in such state court action, No. 8016, the plaintiffs therein seek to oust the United States and the Pueblo from such lands to which the Pueblo has title and possession under the guardianship of the United States; that the United States is not and cannot be made a party to the state court action, No. 8016; that in the instant action the United States has brought before the court all of the interested parties, so that all conflicting claims may be litigated in one action; that a judgment entered in the instant action will be binding upon the Pueblo and all other parties named as defendants in such action; that the state court action, No. 8016, constitutes a threat against and interference with the substantial right of the Pueblo, as a ward of the United States, and the mineral lessee, and that the United States does not have an adequate remedy at law.

That the Anaconda Company discovered a very valuable deposit of uranium-bearing ore in the lands covered by the lease, has proceeded under such lease to develop a mine, known as the Jackpile Mine, from which large amounts of uranium-bearing ore are being removed, and that under the lease the Pueblos have received from the Anaconda Company royalties of approximately $2,900,000.

In United States v. Sandoval, 231 U.S. 28, 47, 34 S.Ct. 1, 6, 58 L.Ed. 107, the court said:

"As before indicated, by an uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the Government have regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes, and, considering their Indian lineage, isolated and communal life, primitive customs and limited civilization, this assertion of guardianship over them cannot be said to be arbitrary, but

---

5. Such lands are particularly described in the complaint.

must be regarded as both authorized and controlling. \* \* \*"[6]

Under the Spanish law and the laws of Mexico the Pueblo Indians in New Mexico, although having full title to their lands, were regarded as in a state of tutelage and under a special national guardianship and they could alienate their land only under governmental supervision and with the approval of designated authorities.[7]

While the "Indians of each pueblo" in New Mexico, "collectively as a community, have a fee-simple title to the lands of the pueblo \* \* \* their lands, like the tribal lands of other Indians owned in fee under patents from the United States, are 'subject to the legislation of Congress enacted in the exercise of the government's guardianship' over Indian tribes and their property."[8]

Two significant manifestations of the purpose of Congress to subject the Pueblo Indians and their lands to such legislation occurred after the decision in United States v. Joseph, 94 U.S. 614, 24 L.Ed. 295, namely: a decision of the Territorial Court of New Mexico in 1904, holding that Pueblo lands were taxable, Territory v. Delinquent Tax List, 12 N.M. 139, 76 P. 307, "was promptly followed by a congressional enactment annulling the taxes already levied and forbidding further levies," Act March 3, 1905, 33 Stat. 1048, 1069; and a decision of the Territorial Court, United States v. Mares, 14 N.M. 1, 88 P. 1128, "construing the statute which prohibits the sale of liquor to Indians and its introduction into the Indian country as not including" the Pueblo Indians or their lands "was shortly followed by an enactment" by Congress "declaring that the statute should be construed as including both," Act June 20, 1910, § 2, 36 Stat. 557, 560.

Section 12 of the Act of June 30, 1834, 4 Stat. 729, 730, 25 U.S.C.A. § 177, provided:

"That no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the constitution. \* \* \*"

The provisions of the last-mentioned statute, "with others 'regulating trade and intercourse with the Indian tribes' was extended over 'the Indian tribes' of New Mexico" by the Act of February 27, 1851, 9 Stat. 574, 587.

In holding that the phrase "Indian tribes" as used in the last two statutes before-mentioned included the Pueblo Indians, the court in United States v. Candelaria, 271 U.S. 432, 441, 46 S.Ct. 561, 563, 70 L.Ed. 1023, said:

"While there is no express reference in the provision to Pueblo Indians, we think it must be taken as including them. They are plainly within its spirit and, in our opinion, fairly within its words, 'any tribe of Indians.' Although sedentary, industrious, and disposed to peace, they are Indians in race, customs, and domestic government, always have lived in isolated communities, and are a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races. It therefore is difficult to believe that Congress in 1851 was not intending to protect them, but only the nomadic and savage Indians then living in New Mexico. A more reasonable view is that the term 'Indian tribe' was used in the acts of 1834 and 1851 in the sense of 'a body of Indians of the same or a similar race,

---

6. See, also, United States v. Candelaria, 271 U.S. 432, 439, 440, 46 S.Ct. 561, 70 L.Ed. 1023.

7. United States v. Candelaria, 271 U.S. 432, 442, 46 S.Ct. 561, 562, 70 L.Ed. 1023.

8. United States v. Candelaria, 271 U.S. 432, 440, 46 S.Ct. 561, 562, 70 L.Ed. 1023.

united in a community under one leadership or government, and inhabiting a particular, though sometimes ill-defined, territory.' "

The court further held in the Candelaria case that Congress had imposed a restriction on the alienation of the lands of the Pueblo Indians, to which the Pueblos had full title, as a continuation of a policy which the governments of Spain and Mexico "had deemed essential to the protection of such Indians."[9]

Finally, the court in the Candelaria case held that the Pueblo Indians "are wards of the United States, and hold their lands subject to the restriction that the same cannot be alienated in any wise without its consent.   *   *   *"; that a transfer of the lands of a New Mexico Pueblo "contrary to the inhibition of Congress would be a violation of the governmental rights of the United States arising from its obligation to a dependent people"; that "no stipulations, contracts, or judgments rendered in suits to which the Government is a stranger, can affect its interest"; and that "The authority of the United States to enforce the restraint lawfully created cannot be impaired by any action without its consent."[10]

Moreover, § 17 of the Act of June 7, 1924, 43 Stat. 636, 641 provided:

> "No right, title, or interest in or to the lands of the Pueblo Indians of New Mexico to which their title has not been extinguished as hereinbefore determined shall hereafter be acquired or initiated by virtue of the laws of the State of New Mexico, or in any other manner except as may hereafter be provided by Congress, and no sale, grant, lease of any character, or other conveyance of lands, or any title or claim thereto, made by any pueblo as a community, or any Pueblo Indian living in a community of Pueblo Indians, in the State of New Mexico, shall be of any validity in law or in equity

unless the same be first approved by the Secretary of the Interior."

That provision insured that the restrictions implicit in the decision in United States v. Sandoval, 231 U.S. 28, 48, 34 S.Ct. 1, 58 L.Ed. 107, would continue in force as to lands, title to which was found to be in the Pueblos.

Counsel for the Alonzos, while impliedly conceding that the lands of the Pueblo generally have at all times been subject to restrictions against alienation, without the consent of the United States, make the narrow contention that lands acquired by the Pueblo by purchase and to which they hold the fee simple title are not subject to restrictions against alienation. They predicate their contention in part on language found in § 2 of the New Mexico, Arizona Enabling Act, 36 Stat. 557, 558, 559, reading as follows:

> "That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to  *  *  *  all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been *acquired through or from the United States or any prior sovereignty,* and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States;  *  *  *." (Italics ours.)

It will be observed, however, that the language of the Act of June 30, 1834, imposes restrictions against the purchase, grant, lease, or other conveyance of lands or of any title or claim thereto from any Indian nation or tribe of Indians, and that the word "lands" is in nowise limited by any express or implied language in the Act.

■    The legislative history of the Enabling Act shows that the purpose of §

---

9. United States v. Candelaria, 271 U.S. 432, 440, 442, 46 S.Ct. 561, 563, 70 L.Ed. 1023.

10. United States v. Candelaria, 271 U.S. 432, 443, 444, 46 S.Ct. 561, 563, 70 L.Ed. 1023.

2, above quoted, was to preclude any possible challenge by the state of titles acquired by Indians through grants made by the Governments of Spain or Mexico. We think it clear there was no intent to limit the provisions of the Act of June 30, 1834.

■ Moreover, the reason for the imposition of the restrictions is in nowise related to the manner in which the Indians acquired their lands. The purpose of restrictions is to protect the Indians, "a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races" [11] against the loss of their lands by improvident disposition or through overreaching by members of other races. There is as great a need for such protection of the Pueblos in New Mexico, with respect to their lands acquired by purchase, as there is to lands otherwise acquired.

Furthermore, the 51,578.19 acres of land of the original Paguate Purchase and the Ranchos lands were acquired by the Pueblo prior to the Treaty of Guadalupe Hidalgo and were owned and possessed by it at the time of the passage of the Act of June 7, 1924. Section 17 of that Act, quoted above, insured that the restrictions which Congress recognized as theretofore existing, with respect to lands owned and possessed by the New Mexico Pueblos, as a community, should continue, except in cases where the Pueblos' title had been extinguished, as provided for in such Act.

Finally, United States v. Candelaria, 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023, was an action brought by the United States as guardian of the Pueblo of Laguna to quiet the title to the lands embraced in the Paguate Purchase and in that case the court held that such lands were subject to restrictions against alienation without the consent of the United States.

■ We are of the opinion that the restrictions against alienation apply to lands acquired by the Pueblo through purchase, as well as to lands acquired by the Pueblo in any other manner.

■■ But if we be wrong in our conclusion, which we do not concede, that the Enabling Act did not by implication remove restrictions with respect to lands acquired by the Pueblos by purchase, such restrictions were clearly reimposed by § 17 of the Act of 1924, which clearly applies without qualification to all lands of the Pueblo Indians of New Mexico. The power of Congress to reimpose restrictions while the Pueblos were still wards of the Nation is not open to question.[12]

With respect to the right of the United States to injunctive relief, we think the decision of the United States in Leiter Minerals, Inc., v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267, is controlling. Leiter brought an action in a Louisiana state court against certain mineral lessees of the United States. Leiter was out of possession, but claimed title to and sought to have itself declared owner of the mineral rights under land owned by the United States and also sought an accounting for oil and other minerals removed by such lessees under their lease from the United States. Leiter founded its claim on Louisiana Act No. 315 of 1940, L.S.A.–R.S. 9:5806, which, it alleged, made "imprescriptible" a reservation of mineral rights in a deed of December 21, 1938, to the United States by its predecessor in title. After the commencement of the state court action the United States filed an independent action to quiet its title to the mineral rights, naming all the parties to the state court action as defendants, and sought a preliminary and permanent injunction to restrain the defendants from further prosecution of the state court action. The Federal District Court issued a preliminary injunction. On appeal, the United States Court of Appeals for the Fifth Circuit affirmed the order grant-

---

11. United States v. Candelaria, 271 U.S. 432, 442, 46 S.Ct. 561, 563, 70 L.Ed. 1023.

12. Brader v. James, 246 U.S. 88, 96, 38 S.Ct. 285, 62 L.Ed. 591; McCurdy v. United States, 246 U.S. 263, 273, 38 S.Ct. 289, 62 L.Ed. 706.

ing the preliminary injunction.[13] The Supreme Court granted certiorari and affirmed the judgment of the Court of Appeals. In its decision the Supreme Court held that the United States was not precluded from seeking injunctive relief by the provisions of 28 U.S.C. § 2283, and that injunctive relief, under the circumstances, was proper.

Counsel for the Alonzos seek to distinguish the Leiter case by reason of the fact that there the Government was the owner of the lands in fee simple and in the instant case the fee simple title to the lands involved is in the Pueblo and the Government is suing to vindicate the title of the Pueblo. But restricted Indian land is property in which the United States has an interest. In United States v. Hellard, 322 U.S. 363, 64 S.Ct. 985, 987, 88 L.Ed. 1326, the question was presented as to whether full-blood Indians of the Five Civilized Tribes could be divested of title to restricted land by a sale pursuant to a judgment of a state court in a partition proceeding to which the United States was not a party. In holding that the United States was not bound by the judgment in the state court action to which it was not a party, the court in its opinion said:

"Restricted Indian land is property in which the United States has an interest. *This national interest is not to be expressed in terms of property, or to be limited to the assertion of rights incident to the ownership of a reversion or to the holding of a technical title in trust.'* Heckman v. United States, 224 U.S. 413, 437, 32 S.Ct. 424, 431, 56 L.Ed. 820. Though the Indian's interest is alienated by judicial decree, the United States may sue to cancel the judgment and set the conveyance aside where it was not a party to the action. Bowling & Miami Investment Co. v. United States, 233 U.S. 528, 34 S.Ct. 659, 58 L.Ed. 1080; Privett v. United States, 256 U.S. 201, 41 S.Ct. 455, 65 L.Ed. 889; Sunderland v. United States, 266 U.S. 226, 45 S.Ct. 64, 69 L.Ed. 259. Under § 2 of the Act of June 14, 1918 lands partitioned in kind to full-bloods remain restricted. Only if the land is sold at partition sale are the restrictions removed. The governmental interest throughout the partition proceedings *is as clear as it would be if the fee were in the United States.* State of Minnesota v. United States, 305 U.S. 382, 387–388, 59 S.Ct. 292, 294, 295, 83 L. Ed. 235; Town of Okemah, Okl. v. United States, 10 Cir., 140 F.2d 963. * * *" (Italics ours.)

We are of the opinion that the Governmental interest in the instant action is as great as it would be if the fee to the lands involved were in the United States. Indeed, since the United States is suing as a guardian of a dependent nation in discharge of a fiduciary duty, its right and duty to protect the interests of its wards may be even greater than it would if it were suing in its own behalf with respect to its own lands.

Counsel for the Alonzos further contend that the United States could have appeared in the state court action and that it was its duty so to do, but in the Leiter case the Supreme Court said [352 U.S. 220, 77 S.Ct. 292]:

" * * * In this case, a private party is seeking by a state proceeding to obtain property currently in the hands of persons holding under the United States; the United States is seeking to protect that possession and quiet title by a federal court proceeding. Therefore, since the position of the United States is essentially a defensive one, *we think that it should be permitted to choose the forum in this case,* even though the state litigation has the elements of an action characterized as quasi in rem. * * *" (Italics ours.)

Accordingly, we conclude that the United States is entitled to injunctive relief.

Affirmed.

13. Leiter Minerals, Inc., v. United States, 5 Cir., 224 F.2d 381.