**LEECH LAKE BAND OF CHIPPEWA INDIANS, Plaintiff,**

v.

**CASS COUNTY, MINNESOTA and, in their official capacities, Sharon K. Anderson, Cass County Auditor; Marge L. Daniels, Cass County Treasurer; Steve Kuha, Cass County Assessor; and John Stranne, James Demgen, Glenn Witham, Erwin Ostlund and Virgil Foster, Cass County Commissioners, Defendants.**

**No. 5–95 CIV 99.**

United States District Court,
D. Minnesota,
Third Division.

Dec. 5, 1995.

**690**

Jacobson, Buffalo, Schoessler & Magnuson, Ltd. by James M. Schoessler, Minneapolis, Minnesota, appeared on behalf of Leech Lake Band of Chippewa Indians.

Earl E. Maus, Cass County Attorney by Earl E. Maus, Walker, Minnesota, appeared on behalf of Cass County.

Cannon, Kunz & Fischer by Peter W. Cannon, Mahnomen, MN, for amicus curiae White Earth Band of Chippewa Indians.

Department of Justice by Judith Rabinowitz, Washington, DC, for amicus curiae United States of America.

## ORDER

ALSOP, Senior District Judge.

■ This matter comes before the Court on Plaintiff Leech Lake Band of Chippewa Indians' motion for summary judgment. The Leech Lake Band of Chippewa Indians (hereinafter the "Band") argues that the ad valorem tax recently imposed by Cass County on land owned by the Band violates principles of Native American sovereignty and is impermissible under existing case law. Cass County argues that, pursuant to recent United States Supreme Court precedent, taxation of these lands is proper. The Court has determined, and all parties have agreed, there are no factual disputes, the issue presented is solely one of law, and the case is ripe for summary disposition. Pursuant to *Burlington Northern R.R. v. Omaha Public Power District*, 888 F.2d 1228 (8th Cir.1989), the Court now decides this issue on summary judgment.[1]

## I. BACKGROUND

### A. Factual History

The Leech Lake Band of Chippewa Indians is a federally recognized Indian Tribe.

---

1. In *Burlington Northern*, the 8th Circuit rejected the argument that a grant of summary judgment for the non-moving party was improper. "It is within the court's power to grant summary judgment sua sponte against the moving party, lacking a cross motion, where the party against whom the judgment is entered has had a full and fair opportunity to contest that there are no genuine issues of material fact to be tried and the party granted judgment is entitled to it as a matter of law." *Burlington Northern R.R. v.* *Omaha Public Power District*, 888 F.2d at 1231, n. 3. Because both parties agree there are no disputed facts, this is purely an issue of law, and the case is ripe for summary judgment, the Court is convinced both parties have had a full and fair opportunity to contest the appropriateness of summary judgment. Although defendants have not moved for summary judgment, all parties agreed at oral argument that summary disposition is appropriate.

The land currently recognized as the Leech Lake Reservation (hereinafter the "Reservation") was initially established by the Treaty of February 22, 1855, 10 Stat. 1165. Three reservations were created by the Treaty of 1855 but were subsequently augmented and connected by treaties with the Mississippi Bands of Chippewa dated May 7, 1864, 13 Stat. 693, and March 19, 1867, 16 Stat. 719. Executive Orders in 1873 and 1874 further enlarged the land constituting the Reservation which continues to exist within the same boundaries notwithstanding the patenting of land to individuals.[2]

In 1889 Congress passed the Nelson Act, pursuant to which the United States conveyed millions of acres of land in Leech Lake and other Chippewa reservations in Minnesota to individual Indians and non-Indians. Act of January 14, 1889, ch. 24, 25 Stat. 642. The Nelson Act took effect in 1890 after agreement was reached with Minnesota's Chippewa Indian population and approved by the President. *See* Folwell, *supra* note 1, at 219–235. Three different methods of conveyance in the Nelson Act are relevant to this lawsuit: § 3 allotments, pine land sales, and homestead sales. Under § 3, the Nelson Act provided that allotments to individual Indians were to be made "in conformity with the act of February eighth, eighteen hundred and eighty-seven, entitled 'An act for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes....'" This reference is to the General Allotment Act of 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. § 331 *et. seq.*) (hereinafter "GAA"). Conveyance procedures for both pine lands and homestead lands are enumerated in the Nelson Act but do not incorporate or make reference to the GAA. Thirteen of the land parcels at issue were initially allotted to individual Indians under § 3, seven were originally sold pursuant to the pine land sales provisions (§§ 4 and 5 Nelson Act), and one was sold pursuant to the homestead provision (§ 6 Nelson Act). The land at issue has been bought and sold since the original issuance of fee patents under the Nelson Act and was reacquired by the Band between 1980 and the present.

Prior to 1993, the land at issue had not been taxed. However, beginning with the 1993 tax year, Cass County began assessing taxes on all of the properties involved. The Band protested the taxes and, after refusing to pay, the Band began to receive delinquent tax notices. The Band eventually paid the taxes on all of the properties and, as of July 1, 1995, had paid Cass County more than $64,000 in taxes, interest, and penalties. The Band seeks: a declaration that the land at issue is not subject to property taxes imposed by Cass County; a refund of all monies paid for taxes, interest and penalties on the properties; an injunction against Cass County and its administrators prohibiting future taxation of this and similarly situated property and ordering the removal of the properties from the Cass County list of properties subject to taxation.

### B. Legal History

In *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), Chief Justice Marshall's premise was that the "several Indian nations [constitute] distinct political communities, having territorial boundaries, within which their authority is exclusive...." *Id.* at 556–57. Justice Marshall and the *Worcester* Court determined it was the national government, and not the states, that would negotiate and interact with the Indian tribes and bands. *Id.* at 557. Although the "platonic notions of Indian sovereignty" no longer stand on their own, in the taxation context, "'absent cession of jurisdiction or other federal statutes permitting it,' ... a State is without power to tax reservation lands and reservations [sic] Indians." *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 257–58, 112 S.Ct. 683, 687–88, 116 L.Ed.2d 687 (1992) (quoting *Mescalero Apache Tribe v.*

---

**2.** Folwell, A History of Minnesota 196 (revised ed. 1956); Royce, Indian Land Cessions in the United States 866, 874 (1899). Most of the history and facts underlying this matter are derived from the Band's well-articulated factual summary submitted in its Memorandum in Support of Summary Judgment.

*Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973)). Further, as the *Yakima* Court recognized, United States Supreme Court precedent indicates a "consistent practice of declining to find that Congress has authorized state taxation unless it has 'made its intention to do so unmistakably clear.' " *County of Yakima,* 502 U.S. at 258, 112 S.Ct. at 688 (quoting *Montana v. Blackfeet Tribe,* 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)).[3] These principles of Indian sovereignty are the backdrop for the United States Supreme Court decision in *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). Because the Court finds the *Yakima* decision controlling, the Court's decision hinges on the interpretation and application of *Yakima.*

## II. DISCUSSION

### A. The Yakima Decision

In 1992, the United States Supreme Court addressed the question of whether the GAA, as amended by the Burke Act of 1906, authorized states to tax land originally allotted to individual Indians and currently owned by either individual Indians or the Indian Tribe or Band. The Supreme Court held that such land is subject to taxation by the State of Washington because Congress deemed it fully alienable.

The Yakima Indian Reservation was established by Treaty in 1855. *See* Treaty between the United States and Yakima Nation of Indians. 12 Stat. 951. Some of the Reservation land was owned in fee as a result of allotments made pursuant to the GAA. Under the GAA, land was to be allotted to individual Indians but held in trust by the United States government for 25 years. Accordingly, the land held in trust was not alienable nor encumberable and, upon expiration of the 25 year trust period, the land would be conveyed to the individual Indian in fee. *Yakima,* 502 U.S. at 254, 112 S.Ct. at 686. GAA § 5. The original § 6 of the GAA provided that "each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside." 24 Stat. 390.

In reaction to *In re Heff,* 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 (1905), in which the Supreme Court held that § 6 subjected Indian allottees to plenary state jurisdiction, Congress passed the Burke Act of 1906, 34 Stat. 182 (1983) (codified at 25 U.S.C. § 349) (hereinafter the "Burke Act Proviso"). The Burke Act Proviso amended § 6 of the GAA to provide that state criminal and civil jurisdiction would lie "[a]t the expiration of the trust period ... when the lands have been conveyed to the Indians by patent in fee." It further gave the President the authority to prematurely terminate the trust period by prematurely patenting the land. Upon premature patenting and conveyance in fee to individual Indians, the Burke Act Proviso provided that "all restrictions as to sale, incumbrance, or taxation of said land shall be removed." 34 Stat. 183.

In holding the Yakima Nation land subject to state taxation, the Supreme Court discussed §§ 5 and 6 of the GAA and its prior decision in *Goudy v. Meath,* 203 U.S. 146, 27 S.Ct. 48, 51 L.Ed. 130 (1906). However, it appears the Court relied on § 5 and the *Goudy* decision. In *Goudy,* the Supreme Court held that an Indian who was himself an allottee of land under the Treaty of December 26, 1854, 10 Stat. at L. 1132, was personally liable for property taxes assessed by the State of Washington. *Goudy,* 203 U.S. at 150, 27 S.Ct. at 50. According to the *Yakima* court, it was the alienability of the Indian land in *Goudy* which rendered it subject to taxation. *Yakima,* 502 U.S. at 263, 112 S.Ct. at 690. In *Yakima,* the court held that alienability was a consequence of § 5 of the GAA and, as a result, "when § 5 rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes." *Id.* at 263–64, 112 S.Ct. at 690–91. Despite the Supreme Court's general rule that state taxa-

---

**3.** A more complete legal history of state taxation of Indian reservations is contained in *County of Yakima v. Confederated Tribes and Bands of the*  *Yakima Indian Nation,* 502 U.S. 251, 257–59, 112 S.Ct. 683, 687–89, 116 L.Ed.2d 687 (1992).

tion of Indian land requires that Congress make its intent to authorize state taxation unmistakably clear, the strong language of the *Yakima* decision leads the Court to the inescapable conclusion that, if Congress has made Indian land freely alienable, states may tax the land. (hereinafter referred to as the "alienability equals taxability" rule).

The Court recognizes that the *Yakima* decision is complex and is open to conflicting interpretations. Despite relying on the *Goudy* decision and espousal of the alienability equals taxability rule, the *Yakima* court discussed § 5 and the implications of the amendment to § 6 via the Burke Act Proviso. The Burke Act Proviso provides, inter alia, that prematurely patented land would be free of "all restrictions as to sale, incumbrance or taxation." 25 U.S.C. § 349. The *Yakima* court stated that "the proviso reaffirmed for such 'prematurely' patented land what § 5 of the GAA implied with respect to patented land generally: subjection to state real estate taxes." *Yakima,* 502 U.S. at 264, 112 S.Ct. at 691. It is difficult to reconcile the *Yakima* court's statement that Congress must clearly manifest its intent to allow taxation with the statement that § 5 merely "implied" subjection to real estate taxes. The only conclusion this Court can draw is that alienation is the touchstone. It appears that for the *Yakima* Court, § 6, as amended, merely reaffirmed its holding that Congress's designation of the GAA land as alienable deemed it taxable. *Id.* at 263–64, 112 S.Ct. at 690–91.

### B. Other Decisions

Three other courts have addressed the issue of whether *Yakima* stands for the proposition that alienability equals taxability. *Lummi Indian Tribe v. Whatcom County, Washington,* 5 F.3d 1355 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2727, 129 L.Ed.2d 850 (1994); *United States ex rel. Saginaw Chippewa Tribe v. Michigan,* 882 F.Supp. 659 (E.D.Mich.1995); *Southern Ute Indian Tribe v. Board of County Commissioners of the County of La Plata, State of Colorado,* 855 F.Supp. 1194 (D.Colo.1994),

vacated, 61 F.3d 916 (10th Cir.1995). Both the *Lummi* and *United States v. Michigan* courts held that, under *Yakima,* alienability equals taxability. In *Southern Ute,* however, the court rejected the notion that, under *Yakima,* alienability equals taxability. The *Southern Ute* decision was not, however, completely at odds with the present Court's decision.[4]

In *Lummi Indian Tribe v. Whatcom County, Washington,* 5 F.3d 1355 (9th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2727, 129 L.Ed.2d 850 (1994), the Ninth Circuit held that, pursuant to the *Yakima* decision, alienability equals taxability and accordingly land conveyed by treaty to the Lummi Indian Tribe is taxable because it is freely alienable.[5] *Id.* at 1358. The *Lummi* court also struggled with the apparent discord between the rule that state taxation of Indian land requires unmistakably clear expression of Congressional intent and the holding in *Yakima* that, if land is alienable, it is taxable. Due to the strength of the language in the *Yakima* decision, however, the court held that because the *Lummi* land is alienable, it is taxable. *Id.* at 1358.

In *United States ex rel. Saginaw Chippewa Tribe v. Michigan,* 882 F.Supp. 659 (E.D.Mich.1995), the court held that land owned by the Saginaw Chippewa Tribe, patented pursuant to treaty and held in unrestricted fee simple was taxable by the State of Michigan. The *United States v. Michigan* court agreed with the *Lummi* court's interpretation of *Yakima.* "If land is subject to alienation, then it is subject to taxes." *United States v. Michigan,* 882 F.Supp. at 677.

One court has disagreed with the view that, under *Yakima,* alienability equals taxability. *Southern Ute Indian Tribe v. Board of County Commissioners of La Plata, State of Colorado,* 855 F.Supp. 1194 (1994), *vacated,* 61 F.3d 916 (10th Cir.1995). In *Southern Ute,* the land at issue was held by the tribe in fee and was originally patented under the Act of June 15, 1880, ch. 223, 21 Stat. 199 ("Act of 1880"), as supplemented by the Act

**4.** The *Southern Ute* decision was vacated by the 10th Circuit on ripeness grounds.

**5.** The lands at issue in both the *Lummi* and *United States v. Michigan* cases were not patented or allotted pursuant to the GAA.

of February 20, 1895, ch. 113, 28 Stat. 677 ("Act of 1895"). *Id.* at 1200–01. Under the Act of 1880, Congress provided that patents in fee simple would be issued to Indians once "the necessary laws are passed by Congress." *Id.* at 1200. The Act of 1880 further provided that:

> The title to be acquired by the Indians shall not be subject to alienation, lease, or incumbrance, either by voluntary conveyance of the grantee or by the judgment, order, or decree of any court, or subject to taxation of any character, but shall be and remain inalienable and not subject to taxation for the period of twenty-five years, and until such time thereafter as the President of the United States may see fit to remove the restriction. . . . *Id.* at 1200–01.

■ Thus, pursuant to the Act of 1880, there are three prerequisites to the taxation of allotted land: (1) Congress must enact "the necessary laws" to accomplish the allotment; (2) the twenty-five year trust period must expire; and (3) the President must act to remove the restriction on alienation and taxation. *Southern Ute,* 855 F.Supp. at 1201. By the Act of 1895, Congress initiated the patenting process. The other two pre-requisites had not been met before Congress passed the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 461–479 (1934). Under the IRA, "existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress." 25 U.S.C. § 462. Accordingly, the land at issue was still subject to the trust restrictions. *Id.* at 1201–02.

■ According to the *Southern Ute* court, the fact that land is alienable does not necessarily lead to the conclusion that it is taxable. Instead, *Yakima* stood for the proposition that alienability is merely indicia of Congress's intent and § 5 of the GAA, by providing for alienability, sufficiently indicated Congress's intent to allow taxation. *Southern Ute,* 855 F.Supp. at 1200. This result is unpersuasive in the situation at hand for two

reasons. First, the *Southern Ute* court's interpretation of *Yakima* minimizes the statement that "when § 5 rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes." *Yakima,* 502 U.S. at 263–64, 112 S.Ct. at 690–91. *Southern Ute* held that alienability is merely indicia of Congress's intent to authorize state taxation of Indian land. This language indicates that alienability is not merely indicia of Congress's intent to authorize taxation but is, in fact, the touchstone for taxability. Second, *Southern Ute* is distinguishable from the situation at hand in that the statute involved in *Southern Ute,* the Act of 1880, specifically deemed the land inalienable. *Southern Ute,* 855 F.Supp. at 1202. The case at hand involves land patented pursuant to the Nelson Act, which incorporated the GAA. The GAA clearly made § 3 land alienable.

## C. The Case at Hand

■ The only remaining issue is whether or not the land in this case is alienable. Defendant Cass County argues the land is freely alienable. Plaintiff Band argues the land is not freely alienable under the Indian Nonintercourse Act. 25 U.S.C. § 177 (1983).[6] The Indian Nonintercourse Act ("Nonintercourse Act") provides that: "No purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. Because the land is not alienable, plaintiff argues, it is not taxable.

Both the *Lummi* and the *United States v. Michigan* courts rejected the same argument. *Lummi,* 5 F.3d at 1358–59; *United States v. Michigan,* 882 F.Supp. at 674. As the *Lummi* court pointed out, no court has held that land made alienable by Congress becomes inalienable when reacquired by Indians. *Lummi,* 5 F.3d at 1359. In fact, the Supreme Court has impliedly held the pro-

---

6. The Band also argues that, because the land is not alienable and Congressional approval is required in order to accomplish a transfer, Cass County may not foreclose on the land. Further,

because foreclosure is not allowed, neither is taxation. This argument fails for the same reason—the land is freely alienable.

tections of the Nonintercourse Act no longer apply once Congress removes restraints on alienation. *See Larkin v. Paugh,* 276 U.S. 431, 433–34, 439, 48 S.Ct. 366, 366–67, 368, 72 L.Ed. 640 (1928). In *Larkin v. Paugh,* the Supreme Court held that once the trust period expires and the patent is issued on the GAA land, the incidental restriction against alienation is terminated. "This put an end to the authority theretofore possessed by the Secretary of the Interior by reason of the trust and restriction—so that thereafter all questions pertaining to the title were subject to examination and determination by the courts...." *Id.* at 439, 48 S.Ct. at 368.

Plaintiff Band cites numerous cases in support of the argument that the Nonintercourse Act makes all Indian land inalienable. *See United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913); *United States v. Candelaria,* 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023 (1926). Although it is clear from these and other cases cited by the Band that the Nonintercourse Act initially applies to all tribal lands, it is not clear whether land sold pursuant to Congressional authorization making the land freely alienable becomes inalienable if later reacquired by a tribe or individual Indian. In *United States v. Sandoval,* the court merely held that Congress has the power to legislate concerning fee lands held by Indians. 231 U.S. at 48, 34 S.Ct. at 6. In *United States v. Candelaria,* the court held that the Nonintercourse Act applies to Pueblo Indian lands when they are initially acquired and therefore operates as a restriction on alienation for the Pueblo lands at issue. 271 U.S. at 442, 46 S.Ct. at 563.

Plaintiff also cites *Alonzo v. United States,* 249 F.2d 189 (1957), *cert. denied,* 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958), for the proposition that tribal fee lands are protected by the Nonintercourse Act regardless of how they were acquired. *Id.* at 196. The court finds the *Alonzo* case unpersuasive in the situation at hand for numerous reasons. First, the *Alonzo* court's rationale for holding that the Nonintercourse Act restricts alienation regardless of how the land was acquired is outdated and unacceptable to the court. "[T]he reason for the imposition of the restrictions is in nowise related to the manner in which the Indians acquired their lands. The purpose of restrictions is to protect the Indians, 'a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races'...." *Id.* at 196.

Second, the *Alonzo* case relied heavily on other statutory provisions in holding the land inalienable. The court stated: "But if we be wrong in our conclusion, which we do not concede, that the Enabling Act did not by implication remove restrictions with respect to lands acquired by the Pueblos by purchase, such restrictions were clearly reimposed by § 17 of the Act of 1924...." *Id.* at 196. The court held the Nonintercourse Act initially imposed restrictions on alienation which were not removed by the Enabling Act. Section 17 of the Act of 1924, however, in clear and unquestionable language, restricted the alienation of the land at issue in *Alonzo*:

No right, title, or interest in or to the lands of the Pueblo Indians of New Mexico ... and no sale, grant, lease of any character, or other conveyance of lands, or any title or claim thereto ... shall be of any validity in law or in equity unless the same be first approved by the Secretary of the Interior. *Id.* at 195.

Of utmost importance is that the land at issue in *Alonzo* was never made freely alienable by Congress. The New Mexico, Arizona Enabling Act, 36 Stat. 557–59, the only statute which arguably affects the alienability of the land in *Alonzo,* reads:

That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to ... all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States....

The *Alonzo* court held this provision did not eradicate the effects of the Nonintercourse Act and thus the land remained inalienable. *Id.* at 196. This result is not surprising as nothing in the Enabling Act even remotely appears to make the land alienable. In the case at hand, however, the land at issue was patented pursuant to the GAA and Nelson Act which clearly establish the free alienability of the land. There is also no provision such as § 17 of the Act of 1924 which reestablishes the inalienability of the land. Accordingly, the result in *Alonzo* is unpersuasive.

■ The inapplicability of the Nonintercourse Act in the situation at hand is further evidenced by the elements required for a cause of action under the Nonintercourse Act. Element three requires that "the United States has never approved or consented to the alienation of the tribal land." *Catawba Indian Tribe v. South Carolina*, 718 F.2d 1291, 1295 (4th Cir.1983), *rev'd on other grounds*, 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986); *Epps v. Andrus*, 611 F.2d 915, 917 (1st Cir.1979); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 56 (2nd Cir.1994).[7] The logical conclusion is that once Congress has approved the alienation of a certain piece of land, the protections of the Nonintercourse Act no longer apply.

The land here at issue was originally patented pursuant to the GAA. Congress provided that, upon the expiration of the 25 year trust period or upon premature termination of the trust period, the land would be conveyed to the individual Indian in fee, free of encumbrances and completely alienable. The land was sold by the Indians at some point in time after 1905 and reacquired between 1980 and the present. There were no restrictions on the initial sale of this land. Once Congress deemed the land alienable under the GAA and Nelson Act, it remained so, even when re-acquired by the Band. Be-

cause the land remains freely alienable, it is taxable.

## D. Alternative Grounds

■ Even if the Supreme Court's decision in *Yakima* does not stand for the proposition that alienability equals taxability and instead merely reiterates the rule that Congress must clearly express its intent to authorize taxation of tribal fee lands, the majority of the land in the instant case would be taxable. Regardless of the rule of law resulting from *Yakima*, on the facts *Yakima* held that land patented pursuant to the GAA, as amended by the Burke Act Proviso, and held in fee by either individual Indians or the Indian Tribe or Band is taxable.

The land at issue was patented and allotted pursuant to the Nelson Act. The procedure utilized for patenting and allotting the majority of the land—§ 3 land—incorporated the GAA. Section 3 of the Nelson Act provided that allotments to individual Indians were to be made "in conformity with the act of February eighth, eighteen hundred and eighty-seven, entitled 'An act for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes....'" (GAA). Because § 3 of the Nelson Act incorporates the GAA, all of the land patented pursuant to § 3 would taxable under this alternative reading of *Yakima*.

The Band argues that because the Nelson Act was enacted in 1889, and the amendment to § 6 of the GAA, the Burke Act Proviso, was enacted in 1906, Congress did not intend that the Nelson Act incorporate the Burke Act Proviso. Further, the Band argues, because the *Yakima* court relied on § 6, the Burke Act Proviso, in holding that Congress had clearly expressed its intent, the case at hand is completely distinguishable from *Yakima*.

Although the Burke Act Proviso makes no reference to the Nelson Act in amending the

7. The four elements are: (1) that it is or represents an Indian tribe within the meaning of the Nonintercourse Act; (2) that the land in issue is covered by the Nonintercourse Act as tribal land; (3) that the United States has never approved or consented to the alienation of the tribal land; (4)

that the trust relationship between the United States and the tribe, established by coverage of the Nonintercourse Act, has never been terminated or abandoned. *Catawba Indian Tribe*, 718 F.2d at 1295.

GAA, the Court is of the opinion that, when incorporating the GAA, the Nelson Act intended to incorporate the GAA patenting procedures and not merely the wording contained in the GAA as it read in 1887. The Burke Act Proviso merely clarified the operation of § 5 and added a premature patenting procedure to § 6. It is reasonable to conclude that Congress intended the Burke Act Proviso to apply to all land patenting procedures which incorporate the GAA.

In addition, it is not clear from the *Yakima* decision whether the Supreme Court felt § 6, as amended by the Burke Act, was significant in determining Congress's intent. In fact, just the opposite appears to be true. Footnote 4 states:

> Since the proviso is nothing more than an acknowledgment (and clarification) of the operation of § 5 with respect to all fee patented land, it is inconsequential that the trial record does not reflect "which (if any) of the parcels owned in fee by the Yakima Nation or individual members originally passed into fee status pursuant to the proviso, rather than at the expiration of the trust period...." *Yakima*, 502 U.S. at 264, 112 S.Ct. at 691.

The Court also stated: "In other words, the [Burke Act] proviso reaffirmed for such 'prematurely' patented land what § 5 of the General Allotment Act implied with respect to patented land generally: subjection to state real estate taxes." *Id.* at 264, 112 S.Ct. at 691. The Supreme Court viewed the Burke Act Proviso as an acknowledgment and reaffirmation of the alienability and taxability of the land. It is § 5 of the GAA which the Supreme Court relied on in finding GAA land taxable. Section 5 was part of the GAA as originally enacted in 1887 and thus was inarguably incorporated into § 3 of the Nelson Act. Accordingly, the thirteen land parcels originally patented under § 3 of the Nelson Act are taxable.

The seven parcels originally sold under the pine land sale provisions (§§ 4 and 5 Nelson Act) and the one parcel originally sold pursuant to the homestead sales provision (§ 6 Nelson Act) would not be taxable, however, under this alternative holding. Although both pine land and homestead sales were provided for in the Nelson Act, they did not incorporate the GAA. Only § 3 of the Nelson Act incorporated the terms of the GAA.

## III. CONCLUSION

In summary, the Court holds that, under *Yakima,* because all of the land at issue in this case is alienable, Cass County may assess and collect taxes on the § 3 land, pine land sale land, and homestead sale land. Because the land is taxable, Cass County has rightfully levied property taxes on the land since 1993 and may lawfully continue to levy property taxes on the land at issue.

Accordingly, upon review of the files, motions, and proceedings herein,

**IT IS ORDERED** that Plaintiff's motion for summary judgment is DENIED.

**IT IS FURTHER ORDERED** that the Clerk enter judgment as follows: IT IS ORDERED, ADJUDGED and DECREED that this action is DISMISSED.