# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 17, 2011

No. 09-30869

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SID-MARS RESTAURANT & LOUNGE, INC.,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before DENNIS, OWEN, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Sid-Mar's Restaurant filed suit in state court demanding compensation from the State of Louisiana for the commandeering of its real property following Hurricane Katrina. While the state court litigation was pending, the United States initiated condemnation proceedings involving part of the same property in the United States District Court for the Eastern District of Louisiana. To avoid potentially conflicting judgments, the United States sought a stay of the state court proceeding. The district court entered a stay, and Sid-Mar's appealed.

We AFFIRM.

No. 09-30869

## BACKGROUND

From 1967 until destroyed by Hurricane Katrina on August 29, 2005, Sid-Mar's Restaurant & Lounge in Metairie, Louisiana was owned and operated by the Burgess family. Sid-Mar's was adjacent to the 17th Street Canal and just outside of the Lake Pontchartrain Hurricane Protection Levee System. After Hurricane Katrina, the Burgesses desired to rebuild in the same location.

In the aftermath of Katrina, the Department of the Army and the Orleans Levee District entered into a Cooperation Agreement. Among other terms, the state agreed to provide the federal government with a right of entry to all lands deemed necessary for various rehabilitation projects. On January 27, 2006, a supplement to the Cooperation Agreement was executed. It provided for the construction of "interim gated closure structures and integrated pumping capacity near the confluence of Lake Pontchartrain with the 17th Street Outfall Canal." This was followed on February 10, 2006, by then-Governor Kathleen Blanco's executive order commandeering the use of specific real property for the project. Among the real property commandeered was the land on which Sid-Mar's formerly stood. The federal government first entered the commandeered property in March 2006 to begin the construction project. It has occupied the property since this time.

On June 2, 2006, the Burgesses and Sid-Mar's (collectively referred to as "Sid-Mar's") filed a lawsuit in state court against the State of Louisiana seeking just compensation for the taking of its real property. The United States was not named as a defendant.

On June 3, 2009, three years and one day after the state suit was filed and while it was still pending, the United States filed two Complaints in

No. 09-30869

Condemnation in federal district court. One was on a .088 acre tract, the other on a .166 acre tract. Those suits were later consolidated. The entities said to have interests in the property were Sid-Mar's, the Sheriff as ex-officio Tax Collector for Jefferson Parish, the State of Louisiana, and certain unknown owners. These parcels were among those subject to Sid-Mar's state court action. The United States simultaneously filed a Declaration of Taking and deposited in the registry of the court the sum it estimated to be just compensation. The declaration and the deposit vested title in the United States to the real property it sought to condemn. *See* 40 U.S.C. § 3114(b).

Two days after the federal condemnation proceedings began, Sid-Mar's filed for a partial summary judgment in state court. Sid-Mar's argued it had acquired title by adverse possession and was the sole owner when the State of Louisiana commandeered the property in 2006. The State responded in part by arguing that Sid-Mar's title was unclear. A hearing was set for July 21, 2009.

The day before the scheduled hearing, the United States filed a motion in the condemnation suit to stay the state court proceedings. It argued that a stay was necessary to aid and protect the federal court's jurisdiction. The district court agreed and on July 21 enjoined the defendants from prosecuting the state court suit until authorized by a later order of the federal court. Sid-Mar's timely filed an interlocutory appeal. *See* 28 U.S.C. § 1292(a)(1).

DISCUSSION

Sid-Mar's makes two claims on appeal: the Anti-Injunction Act precluded the issuance of this stay, and even if not prohibited, the issuance of a stay was not proper on the facts of this case. We will consider both arguments.

3

No. 09-30869

*A. Applicability of Anti-Injunction Act*

The Anti-Injunction Act prohibits federal courts from enjoining state court proceedings. 28 U.S.C. § 2283. Congress enacted the prohibition in 1793, in part "to work out lines of demarcation between" the independent court systems of the national government and of each state. *Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970).

There are three statutory exceptions that permit the issuance of an injunction. *See* 28 U.S.C. § 2283. None of them apply here. The Supreme Court has interpreted the Anti-Injunction Act to allow the United States to obtain a stay even when it cannot meet any of the exceptions. *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 225-26 (1957). The Court held that Congress did not intend the Anti-Injunction Act to apply "when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest." *Id.* An injunction is not automatically proper, though, merely because the United States seeks it. We will discuss this point in the last section of our opinion.

The district court issued a stay in reliance on *Leiter Minerals*. It concluded that the federal suit was the only one that "can finally determine the basic issue in the litigation," which was the amount and recipients of compensation. The court also noted that the summary judgment motion pending in the state court sought to have Sid-Mar's found to be the owner of the property. Were that finding made, it would "undermine[] this Court's ability to determine to whom compensation should be paid as part of the federal takings procedure." Consequently, a stay was proper.

Sid-Mar's argues that the district court erred by holding that the *Leiter Minerals* doctrine applies when the United States is the party seeking a stay. Instead, Sid-Mar's asserts that for *Leiter Minerals* to apply, there must be a

4

No. 09-30869

federal interest that predates the state court litigation and requires protection from irreparable injury. The federal interest, Sid-Mar's argues, did not exist until the United States brought its condemnation suit three years after the state court litigation. We will explain why we place an earlier date on the federal interest. Sid-Mar's also argues *Leiter Minerals* does not control because state interests predominate over federal ones; the federal government's title to property is not at issue in the state suit; there is no risk of inconsistent judgments in the two suits; the state litigation was pending for three years before the federal condemnation action was commenced; and the relevant flood-control project combines local, state, and federal interests.

Sid-Mar's identifies distinctions that can be made between the facts of the present case and those in *Leiter Minerals*. We consider Sid-Mar's arguments regarding the reasons *Leiter Minerals* should not apply at all as relevant to the question of whether the district court erred in concluding that the circumstances of this case justified the stay.

### B. *Propriety of Stay in These Circumstances*

The Supreme Court in *Leiter Minerals* acknowledged that even when the United States is the party who has obtained a stay of state court proceedings, it still must be decided whether "an injunction was proper in the circumstances of this case." *Id*. at 226. Sid-Mar's articulates the issue slightly differently. It argues that even if the Anti-Injunction Act does not apply, the court "must also assess whether principles of comity and federalism counsel restraint." *Regions Banks of La. v. Rivet*, 224 F.3d 483, 495 (5th Cir. 2000) (citations omitted). We have stated that when a district court rules on whether to enjoin state court proceedings, we review that determination for an abuse of discretion. *United States v. Billingsley*, 615 F.3d 404, 408-09 (5th Cir. 2010). Regardless of the

5

No. 09-30869

precise articulation of our appellate task, we must answer whether the stay was proper considering the facts of the particular case.

We review the circumstances that justified a stay in *Leiter Minerals*. In 1949, the United States granted leases on mineral rights it allegedly owned in Louisiana. *Leiter Minerals, Inc. v. United States,* 224 F.2d 381, 383 (5th Cir. 1955), *modified and affirmed*, *Leiter Minerals*, 352 U.S. at 230. In 1953, Leiter Minerals brought suit in state court against the mineral lessees, *i.e.*, it did not join the United States as a defendant. *Leiter Minerals*, 352 U.S. at 221. It sought a declaration that it owned the mineral rights, and the United States had by operation of state law never acquired title. *Id.* After the state court suit was filed, the United States brought suit in federal district court to quiet title to the mineral rights. *Id.* at 222-23. The Supreme Court held that only the federal suit could "finally determine the basic issue" of whether title was in the United States because "title to land in possession of the United States under a claim of interest cannot be tried as against the United States by a suit against persons holding under the authority of the United States." *Id.* at 226 (citing *United States v. Lee*, 106 U.S. 196 (1882)). Further, even if the state court sought to avoid as much conflict with the federal court as possible, its judgment could result in confusion because the basic issue of title could not be resolved by the state court. *Id.* at 226-27. Finally, the United States was seeking to protect the possession of the persons to whom it granted leases by quieting title in federal court. *Id.* at 227-28. The action was largely defensive, and the court held that the government should be allowed to choose its forum. *Id.* at 228.

Leiter Minerals also presented an alternative reason there should be no stay. It moved to dismiss the United States' complaint in federal court "on the

ground that the state court had already assumed jurisdiction over the property in question . . . ." *Id.* at 223. Leiter Minerals relied on a case where the Supreme Court would not allow the United States to enjoin an ongoing state court proceeding in federal court because "the state court had obtained jurisdiction over the [property] first and . . . the litigation should be resolved in that court." *Id.* at 227 (citing *United States v. Bank of N.Y. & Trust Co.*, 296 U.S. 463 (1936)). The United States, in *Bank of New York*, attempted to recover funds over which it claimed ownership that were subject to a state court liquidation. *Bank of N.Y. & Trust Co.*, 296 U.S. at 470. The basis of the government's claim was that the property at issue in the state suit had been assigned to it before the liquidation occurred. *Id.* The Court would not enjoin the proceeding because the state court asserted its control over the property first. *Id.* at 475-76.

The Court in *Leiter Minerals* was unswayed by this argument, finding the situation different than what was before the Court in *Bank of New York*. *See Leiter Minerals*, 352 U.S. at 227. The United States in *Bank of New York* was acting "like any private claimant" trying to acquire property "it never possessed and that [was] in the hands" of a party appointed by the state court to liquidate an insurance company. *Id.* at 227-28. In *Leiter Minerals,* the United States, as mentioned above, was in a defensive posture, "seeking to protect . . . possession and quiet title by a federal court proceeding." *Id.* at 228. Speaking directly to Leiter Minerals' argument that the government could not enjoin the state court litigation because the state court had been the first to acquire jurisdiction over the property, the Court wrote that the United States should be able to choose its forum "even though the state litigation has the elements of an action

No. 09-30869

characterized as *quasi in rem*." *Id.* (emphasis added). *Leiter Minerals* contemplated the government's ability to enjoin state court litigation when its interest in the subject property went beyond a claim that could be asserted by a private creditor. *See id.*

This part of the *Leiter Minerals* reasoning evokes but did not elaborate on a doctrine that is sometimes called the "prior-exclusive-jurisdiction rule," helpfully discussed at some length in a key treatise on federal court practice. *See* 13F Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3631 (3d ed. 2009). The authors write that "when a state or federal court of competent jurisdiction has obtained possession, custody, or control of particular property, that authority and power over the property may not be disturbed by any other court[,]" and cite an array of Supreme Court cases for this proposition. *Id.* (collecting cases). The "prior-exclusive-jurisdiction rule" applies even when the United States is a party. *Id.* Neither party in the present appeal has discussed this doctrine, though the focus on *Leiter Minerals* at least tangentially touches on it. We will briefly explore the doctrine.

The Supreme Court, principally in cases that predate *Leiter Minerals*, frequently referred to the principle "that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other . . . ." *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 466 (1939); *see also Farmers' Loan & Trust Co. v. Lake St. Elevated R.R. Co.*, 177 U.S. 51, 61 (1900); *Freeman v. Howe*, 65 U.S. 450, 459 (1860). The primary reason for this rule is "one of necessity to prevent unseemly conflicts between the federal and state courts and to prevent the impasse which would arise if the federal court were unable to maintain its possession and control of the property,

8

which are indispensable to the exercise of the jurisdiction it has assumed." *Mandeville v. Canterbury*, 318 U.S. 47, 49 (1943).

Wright and Miller make no allowance for a situation where, as in *Leiter Minerals*, the government's attempted federal lawsuit is largely defensive and attempts to mitigate the possible effect state court litigation might have on the government's rights, including avoidance of conflict with a later-filed federal lawsuit. *See Leiter Minerals*, 352 U.S. at 227-28. *Leiter Minerals* squarely addressed the petitioner's attempted application of this rule and identified a set of facts that allow a government-filed action to take precedence over this longstanding principle. *Id.*

In this arena, *Leiter Minerals* has a limited but powerful impact. Where the United States is a party, and it asserts a claim of right to a piece of property that is subject to ongoing litigation in state court, the government will be able to enjoin that litigation to protect its interests if certain conditions are met. *Leiter Minerals* identified several factors that could allow the government to take this step: the state court's inability to make a complete determination of the basic issue in the litigation, confusion that could be caused by inconsistent judgments, and a claim of right or interest in the property that precedes the state court litigation. *See id.* at 226-28. Therefore, the "prior-exclusive-jurisdiction rule" must be read in light of the principles supporting *Leiter Minerals.*

In the years following the *Leiter Minerals* decision, courts of appeals have had few opportunities to apply its holding to cases involving the United States as a party. One case deserves our focus because a sister circuit applied the "prior-exclusive-jurisdiction rule" to deny the United States' request to enjoin

a state court proceeding in which the government claimed an interest in the property subject to litigation. *See United States v. Certified Indus., Inc.*, 361 F.2d 857 (2d Cir. 1966). In *Certified Industries*, a sub-contractor filed a mechanic's lien against a contractor in New York state court to recoup unpaid fees and later attempted to foreclose on the lien. *Id.* at 859. The United States, seeking unpaid taxes from the same contractor, later filed an action in federal district court, asserting a state-law claim to impose a trust on funds owed to the contractor. *Id.* The district court granted the government a preliminary injunction which enjoined the state court suit. *Id.*

The Second Circuit reversed, concluding that the principles of *Leiter Minerals* were inapplicable. *Id.* at 860. The subcontractor's assertion of the lien in state court was not, in the court's view, "a direct or an indirect challenge to the right of the United States to retain funds or title to property in its possession at the commencement of the state proceeding." *Id.* at 861. Therefore, *Certified Industries* presented facts more closely akin to *Bank of New York* than *Leiter Minerals*. *See id.* at 861-62. The Second Circuit applied the "prior-exclusive-jurisdiction rule" and vacated the injunction. *See id.*

*Certified Industries* is part of a line of cases that apply the "prior-exclusive-jurisdiction rule" to factual scenarios where the concerns that prompted *Leiter Minerals* are not present. The facts in today's case, however, are more closely aligned with those in *Leiter Minerals* than either *Certified Industries* or *Bank of New York*. In *Certified Industries*, the court focused on the government's lack of possession of the property at issue in the state court suit when that suit was filed to find the "prior-exclusive-jurisdiction rule" should preclude enjoining the state proceedings. *See id.* at 861.

No. 09-30869

Here, beginning in March 2006, the interest of the United States, as asserted by the State of Louisiana's commandeering, has been clear. Indeed, it was the government's delay in pursuing its claims that, according to Sid-Mar's, led Sid-Mar's to file its own state court suit. We discuss later the nature of the interest the United States gained. We also will discuss that the precise interest gained either by Louisiana or the United States by the act of commandeering is unclear, but what is beyond question is that Louisiana acted in concert with the United States in taking control of this property prior to the state court litigation. This prior assertion of control distinguishes our circumstances from those in *Certified Industries* or *Bank of New York*, where the government had no control over or title in the property involved in the state court suits they attempted to enjoin in federal court. *See id.*; *Bank of N.Y. & Trust Co.*, 296 U.S. at 470, 475-77.

In our case, the United States claimed the state court litigation could interfere with the federal condemnation because the suits involved some of the same property and there was a risk of inconsistent judgments. The federal condemnation action required the United States to pay the former owner of the property from whom title had been taken by the Declaration of Taking. In the state court suit, Sid-Mar's sought to have itself determined to be the owner and to receive compensation from the State of Louisiana. The United States argued that Louisiana had not taken the subject property. Because Sid-Mar's had not joined the federal government as a party, the United States could not remove the suit to federal court. Finally, the United States argued it was entitled to have its rights and interests in the property resolved in federal court.

11

No. 09-30869

The parties agree on appeal about one error in the district court's stay order. In its summary of facts, the district court stated the federal court condemnation suit was filed at the same time as Sid-Mar's state court suit. In fact, the state court action predates the federal suit by three years. The parties do not agree on the importance of the error. As will be discussed, we find none.

Sid-Mar's denied there was any risk of inconsistent judgments or any burdens of the rights of the United States. Its explanation starts with describing what occurred prior to the federal condemnation. The property was commandeered on February 10, 2006. The authority for the seizure was the Louisiana Homeland Security and Emergency Assistance and Disaster Act. La. Rev. Stat. § 29:721. According to the governor's executive order, Louisiana "commandeer[ed] the use" of about ten acres. The commandeering was at the request of the Army Corps of Engineers and was for levee and floodwall construction. The executive order also required that the owners be identified and compensated.

According to Sid-Mar's, the government was dilatory in identifying and paying owners of the commandeered property. Thus, in June 2006, Sid-Mar's brought suit against the State of Louisiana. The litigation had not been resolved when in February 2009, a trial date of August 3, 2009 was set. On June 2, the State sought leave to file a third-party demand against the Corps of Engineers. The federal government almost immediately removed the suit to federal court. Within days, the action was remanded, and the Corps was never made a party.

The day after the short-lived removal of the state court suit, the United States filed this condemnation action. Sid-Mar's argues there was no need to file the condemnation action, as the State of Louisiana and the Corps of Engineers

had possession of the property for over three years, a period beginning with the Louisiana governor's order to commandeer the property. Sid-Mar's argues it should be allowed to proceed against Louisiana. Only issues of state law will be involved, Sid-Mar's says, as it does not challenge the federal government's right to condemn the same property.

Sid-Mar's agrees that the acquisition of title by the United States and the setting of the compensation it will pay are matters solely for the federal suit. Sid-Mar's contends, though, that there is no possibility the state court judgment would conflict with the federal judgment. It alleges the state and federal courts will examine who held title to the property during separate time periods, *i.e.*, the state proceedings will determine who had title when the commandeering occurred. Sid-Mar's argues Louisiana must have had title on June 3, 2009, when the United States took the land. As stated in its brief, "the federal condemnation proceedings will determine the compensation the Government owes the State, as the owner of the property at the time of the" Declaration of Taking. In effect, Sid-Mar's alleges there have been two seizures of title, first by Louisiana from Sid-Mar's, then by the United States from Louisiana. Sid-Mar's shapes its argument about title being in the State of Louisiana from 2006 to 2009 into an impenetrable barrier, preventing the state court suit's decision on title from affecting the federal suit's decision-making.

Having set up the issues in the two suits in this way, Sid-Mar's then discusses at some length the case that it argues is most analogous to the present suit. *See Eden Memorial Park Ass'n v. United States*, 300 F.2d 432 (9th Cir. 1962). In that case, the United States had agreed to the State of California's request to condemn part of a cemetery and then to convey it to the state to

construct an interstate highway. *Id.* at 433-34. The request had followed a state appellate court's holding that the relevant state agency had no authority to condemn a cemetery for a highway. *Id.* at 434. After the federal condemnation was filed, the cemetery owner filed in state court to enjoin the state agencies from taking possession of the property condemned by the United States or to construct a highway across the cemetery. *Id.* at 435-36. The federal district court entered a stay. *Id.* at 436.

The Ninth Circuit held that *Leiter Minerals* gave federal courts authority to issue stays against state court suits whenever the applicant was the United States, but the stay was not proper in the circumstances of that case. *Id.* at 437-39. The cemetery owner was not contesting the ownership of the United States to the land, and thus the federal court did not need a stay to protect its jurisdiction. *Id.* at 437. Further, the condemnation suit would fully invest the United States with title to the part of the cemetery property it sought. *Id.* at 437-38. Whether state law could thereafter block construction across the cemetery would not be an issue for the condemnation action. *Id.* at 438-39.

In contrast, Leiter Minerals had been enjoined from prosecuting its action against the mineral lessees in state court because the United States might suffer "irreparable injury in the form of loss of royalties . . . from any temporary, wrongful dispossession of its lessees by the state court proceedings." *Leiter Minerals*, 352 U.S. at 223. Because the title of the United States to the minerals could only be finally determined in federal court, there was the potential for conflicting judgments if the state court proceedings were not stayed. *Id.* at 228.

Sid-Mar's argues there is no potential for conflicting judgments here, just as there was not in *Eden* and unlike *Leiter Minerals*. In Sid-Mar's view, no

conflict will arise because the federal court may decide title (in the State of Louisiana) and the compensation amount (presently unknown) without needing to know the result of the state court suit.

The argument, able as it is, requires our accepting the premise that in 2009, title was in the State of Louisiana. The premise may, however, be false. The United States concedes that it is uncertain what estate is seized by the act of commandeering. Determining what property interest Louisiana acquires by commandeering begins with the relevant statute. Pursuant to the Louisiana Homeland Security and Emergency Assistance and Disaster Act (the "Act"), the governor has the authority to "commandeer or utilize any private property" found necessary to cope with a disaster or emergency subject to applicable compensation requirements. La. Rev. Stat. § 29:724D(4). The Sid-Mar's property was commandeered in order to provide the United States with "right of entry to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas" as needed for the repairs to the 17th Street Canal. The Executive Order specifically reserved to the private owners "all such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired" by the commandeering.

In addition, the Cooperation Agreement between the United States and the State of Louisiana contemplated that the State would commandeer property such as that involved in this suit. It then provided that the United States would "obtain a deed or servitude agreement, as appropriate," to the property. If necessary, the United States would acquire property in its name through eminent domain. These terms support the proposition that the act of commandeering displaced Sid-Mar's right to use the property, but it was

15

No. 09-30869

understood that the United States would thereafter acquire the interests it needed through negotiation or by eminent domain.

It is unresolved whether the premise of Louisiana's ownership from 2006 to 2009 is correct. If Sid-Mar's or other owners still had title because title was among "such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired" by the commandeering, then the condemnation is necessary to establish that title and the compensation due. There remains a serious issue of who is to receive the compensation in the federal condemnation suit. To the United States, that uncertainty makes *Leiter Minerals* factually similar. There could be conflicting just-compensation awards that are based on different interpretations of the interests acquired by the act of commandeering. In addition, if title were not acquired by Louisiana through commandeering this property, another question will be how compensation for the loss of use prior to condemnation is to be calculated and who is to pay it. We do not need to decide the state law issues. Resolving them in the most appropriate manner that still protects the jurisdiction of the district court for the condemnation action is a matter to be considered on remand.

The district court was correct about the potential conflict between state and federal judgments concerning who held title to the property at the time of the June 3, 2009 taking by the United States, and how the amount of compensation due. Without deciding the issue of ownership, it is possible the United States had a claim to the land that preceded the commencement of the state court lawsuit. Since March 2006, the federal government has been in continuous possession of the land. Further, the Executive Order that acted to commandeer the property referred specifically to the Cooperation Agreement

16

No. 09-30869

between the United States and the Orleans Levee District in the section that set out compensation for the previous owner of the property. That Cooperation Agreement, as mentioned above, indicated the federal government would later acquire full ownership rights in the property.

One circuit court, applying *Leiter Minerals*, has allowed the government to enjoin state court litigation involving a piece of property because the government held a future interest in that property. *See Alonzo v. United States*, 249 F.2d 189, 196-97 (10th Cir. 1957). At the very least, the uncertainty surrounding the ownership of this property and the extent of the United States' interest militates in favor of enjoining the state court litigation.

Sid-Mar's also argues that *Leiter Minerals* was incorrectly decided. We understand the argument may be offered in order to preserve it for possible review by the Supreme Court. Surely all also understand that this court does not have the authority to overturn a Supreme Court ruling.

Central to the final resolution of the condemnation issues is whether the State of Louisiana acquired title by the act of commandeering. The Supreme Court in *Leiter Minerals* also faced a foundational issue of state law. After holding that a stay was permissible, it also suggested the need for the federal court to receive the opinion of the state court on the state law issues.

> Before attempting to answer [the state law questions] and to decide their relation to the issues in the case, we think it advisable to have an interpretation, if possible, of the state statute by the only court that can interpret the statute with finality, the Louisiana Supreme Court. The Louisiana declaratory judgment procedure appears available to secure such an interpretation, and the United States of course may appear to urge its interpretation of the statute. It need hardly be added that the state courts in such a proceeding can

17

No. 09-30869

decide definitively only questions of state law that are not subject to overriding federal law.

We therefore modify the judgment of the Court of Appeals to permit an interpretation of the state statute to be sought with every expedition in the state court in conformity with this opinion.

*Leiter Minerals,* 352 U.S. at 229-30 (citations omitted).

The Louisiana Supreme Court subsequently ruled on the declaratory judgment. *Leiter Minerals v. California Co.*, 132 So. 2d 845, 849-50 (La. 1961).

The district court will need to determine the best manner in which to proceed in reaching an answer to the title questions that arise because of the commandeering. It might resolve the question itself, lift the stay for the limited purpose of allowing the state court to determine title, or take other steps to avoid the potential for inconsistent rulings in the two proceedings.

AFFIRMED.

No. 09-30869

DENNIS, Circuit Judge, dissenting:

I respectfully dissent because the majority refuses to apply the "prior exclusive jurisdiction doctrine" under which the United States is not entitled to an injunction staying state court proceedings where the state court is the first court to assume jurisdiction over the subject matter property of an action in rem or quasi in rem. *United States v. Bank of N.Y. & Trust Co.*, 296 U.S. 463, 477-81 (1936); *United States v. Certified Indus., Inc.*, 361 F.2d 857 (2d Cir. 1966); *see also Penn Gen. Cas. Co. v. Pennsylvania ex rel. Schnader*, 294 U.S. 189 (1935). The majority misapplies the Supreme Court's decision in *Leiter Minerals, Inc. v. United States*, 352 U.S. 220 (1957), by broad, rough analogy and holds that the prior exclusive jurisdiction doctrine does not apply when the United States brings suit offensively in federal court to condemn private property. Thus, the majority sweepingly abrogates the prior exclusive jurisdiction doctrine in this circuit in respect to subsequently filed federal condemnation suits by allowing and perhaps compelling federal district courts, at the government's request, to enjoin and supersede prior filed state court in rem condemnation proceedings involving the same property. In my view, however, *Leiter Minerals,* at most, creates only a very narrow exception to the doctrine, when the United States sues defensively to quiet its pre-existing title to property, that does not apply here. In *Leiter Minerals*, the Supreme Court indicated that where the United States' position is "defensive" it should be able to choose its forum "even though the state litigation has the elements of an action characterized as quasi in rem." *Leiter Minerals,* 352 U.S. at 228. However, the position of the United States in this action is offensive, not defensive; it is not seeking to quiet its title to property that it already claims to own, as was the case in *Leiter Minerals*, but

19

No. 09-30869

to supersede the state court's jurisdiction and acquire title to the property in the first instance by condemnation. Furthermore, Sid-Mar's assertion of their state constitutional rights in an in rem inverse condemnation proceeding against the state in state court is neither a direct nor an indirect challenge to the right of the United States to bring a condemnation action against whomever the state court declares to be the owner of the subject property under Louisiana property law. The present case is more akin to *Bank of New York & Trust Co.*, in which the Supreme Court relied on the prior exclusive jurisdiction doctrine "in remitting the United States to the state court, [because] the Court saw no 'impairment of any rights' or 'any sacrifice of its proper dignity as a sovereign.'" *Leiter Minerals*, 352 U.S. at 227 (quoting *Bank of N.Y. & Trust Co.*, 296 U.S. at 480-81).

## I.

The United States brought this suit to condemn approximately 0.166 acres of land abutting Lake Pontchartrain in Jefferson Parish, Louisiana for a federal hurricane protection and flood control project. Upon the United States' motion, the district court asserted jurisdiction over the 0.166 acres and enjoined the alleged private owners' pending state court inverse condemnation suit against the State of Louisiana for taking and ousting them from the same property, in addition to other parcels. In that state court action, the plaintiffs had alleged that the State had physically taken 10.2 acres—including the 0.166 acres of their property that the United States seeks to condemn in the present federal case—without compensating them for the taking.

## A.

Prior to Hurricane Katrina, which struck New Orleans and Jefferson Parish in August, 2005, Sidney and Marion Burgess, and their Louisiana

corporation, Sid-Mar's Seafood Restaurant & Lounge, Inc., (collectively "Sid-Mar's") allegedly maintained and operated a seafood restaurant, on or near the 0.166-acre res, which was destroyed by the storm. On February 10, 2006, the Governor of Louisiana, pursuant to Louisiana Revised Statutes § 29:721 *et seq.,* commandeered 10.2 acres of land, including the 0.166 acres at issue in this case, for emergency hurricane protection and flood control purposes. Louisiana Revised Statutes § 29:721 *et seq.* authorizes the Governor to take private property if necessary to cope with a disaster or emergency, subject to any applicable requirements for compensation; and provides that the amount of compensation shall be calculated in the same manner as for a taking of property pursuant to the condemnation laws of Louisiana. *See* La. Rev. Stat. Ann. §§ 29:722, 29:724, 29:730.

The Governor's February 10, 2006 commandeering order declared that a state of emergency continued to exist after Katrina because of the potential for future hurricanes to cause severe flooding, damage to private and public property, and danger to the safety and security of citizens; that the United States Army Corps of Engineers and numerous state and local officials and entities had requested that the Governor commandeer the property for the construction of the Lake Pontchartrain Louisiana and Vicinity Hurricane Protection Project, 17th Street Outfall Canal Interim Closure Structure, and necessary appurtenances and clearings, "reserving however, to the landowners, their heirs and assignees, all such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired"; that the subject property containing approximately 10.2 acres had been commandeered as required by the Department of the Army; that the owners of the

No. 09-30869

commandeered property shall be identified and compensated in accordance with the terms of the Cooperation Agreement Between the United States of America and the Orleans Levee District for Rehabilitation of a Federal Hurricane/Shore Protection Project executed on October 21, 2005, as supplemented by Supplemental Agreements Nos. 1 and 2, dated January 27, 2006; and that the Division of Administration, State Land Office, shall take immediate steps to grant right of entry to the property commandeered for the above purposes pursuant to this order.

On June 2, 2006, Sid-Mar's filed suit against the State of Louisiana, through the Governor and the Division of Administration, State Land Office, in the 24th Judicial District of Louisiana in Jefferson Parish, alleging that Sid-Mar's were owners of property included within the property taken by the Governor's February 10, 2006 commandeering order; that the State of Louisiana has physically occupied Sid-Mar's property and deprived Sid-Mar's of any use of or access to that property; that on February 13, 2006, construction of the Lake Pontchartrain Louisiana and Vicinity Hurricane Protection Project, 17th Street Outfall Canal Interim Closure Structure began on the property; but that the state has not compensated Sid-Mar's for the property taken or their resulting damages; and that Sid-Mar's were entitled to compensation and damages as a result of the commandeering or taking of the property and to other legal and equitable relief pursuant to Louisiana law.[1]

**B**.

---

[1] On June 5, 2009, Sid-Mar's filed a motion for partial summary judgment in their state court suit, but before any state court decision thereon, the federal district court enjoined the state proceedings on July 21, 2009 as described below.

No. 09-30869

In the present federal case, on June 3, 2009, the United States filed this action in the United States District Court for the Eastern District of Louisiana against the 0.166-acre sub-part of the commandeered property involved in Sid-Mar's state court suit, seeking to take and condemn that 0.166 acres for the construction, repair and rehabilitation of a federal project, *viz.*, the Lake Pontchartrain, Louisiana and Vicinity Hurricane Protection Project, 17th Street Outfall Canal, Interim Control Structure, Jefferson Parish, Louisiana.[2] Sid-Mar's and others were named as defendants. The government prayed for judgment granting it a fee simple title to the land, reserving to the landowners only the right, title and interest to the underlying minerals.

On July 21, 2009, pursuant to the United States' motion, the district court enjoined Sid-Mar's from further prosecution of their state court inverse condemnation suit against the State of Louisiana. The federal district court's decree stated it had the authority to issue the injunction because the Anti-Injunction Act, 28 U.S.C. § 2283, does not apply when the United States seeks to stay state court proceedings, citing *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 226 (1957), for this proposition. Moreover, the district court concluded that "this case is sufficiently analogous to the factual situation in *Leiter* [*Minerals*], where the Supreme Court held that a stay of state court proceedings was appropriate," to warrant an injunction. It explained that similar to *Leiter Minerals*, the suit in federal court is "the only one that [can] finally determine the basic issue in the litigation." (alteration in original) (quoting

---

[2] This appears to be the same or a similar project for which the Louisiana Governor commandeered the subject property on February 10, 2006. However, neither the pleadings nor the parties' briefs explain whether the state project and the federal project are one and the same.

*Leiter Minerals*, 352 U.S. at 226) (internal quotation marks omitted). "In addition, currently pending before the state court is a motion for partial summary judgment. Plaintiffs in that case seek a state court order declaring plaintiffs the rightful owners of property currently at issue in this federal matter. Such a finding by the state court specifically undermines this Court's ability to determine to whom compensation should be paid as part of the federal takings procedure. The Court is mindful that although it is rare that a federal court will enjoin and stay a state court proceeding, the government's motion fits squarely within clearly established law on when such a stay is appropriate." After the injunction issued, Sid-Mar's moved the district court to lift the injunction in light of their previously filed state court inverse condemnation proceeding. However, the district court denied that motion in an oral order without any additional findings of fact or conclusions of law. Sid-Mar's timely filed an interlocutory appeal. *See* 28 U.S.C. § 1292(a)(1).

## II.

It is well settled that "if two suits [are] pending, one in a state and the other in a federal court, [and they] are in rem or quasi in rem, so that the court or its officer must have possession or control of the property which is the subject matter of the suits in order to proceed with the cause and to grant the relief sought, the court first acquiring jurisdiction or assuming control of such property is entitled to maintain and exercise its jurisdiction to the exclusion of the other." *Mandeville v. Canterbury*, 318 U.S. 47, 48-49 (1943). Accordingly, "an abundance of federal decisional law, including an impressive array of Supreme Court

decisions,[3] makes it clear that in all cases involving a specific piece of property, real or personal (including various forms of intangible property), the federal court's jurisdiction is qualified by the ancient and oft-repeated rule—often called the doctrine of prior exclusive jurisdiction—that when a state or federal court of competent jurisdiction has obtained possession, custody, or control of particular property, that authority and power over the property may not be disturbed by any other court." 13F Charles Alan Wright et al., *Federal Practice & Procedure* § 3631, at 271-72 (3d ed. 2009).

"Although the prior-exclusive-jurisdiction rule is based at least in part on considerations of judicial comity, it very often is referred to as a jurisdictional limitation, and *has been applied even when the United States is a party." Id.* at 275-77 (emphasis added) (footnotes omitted); *see also Penn Gen. Cas. Co.*, 294 U.S. at 195 ("To avoid unseemly and disastrous conflicts in the administration of our dual judicial system, *see Peck v. Jenness*, 48 U.S. (7 How.) 612, 625 (1849); *Taylor v. Carryl*, 61 U.S. (20 How.) 583, 595 (1857); *Freeman v. Howe*, 65 U.S.

---

[3] The Wright and Miller treatise cites the following cases as supporting this proposition: *Mandeville*, 318 U.S. 47; *Toucey v. N.Y. Life Ins. Co.*, 314 U.S. 118 (1941); *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456 (1939); *Penn Gen. Cas. Co.*, 294 U.S. 189; *Harkin v. Brundage*, 276 U.S. 36, 43 (1928); *Lion Bonding & Sur. Co. v. Karatz*, 262 U.S. 77, 88-90 (1923); *Kline v. Burke Constr. Co.*, 260 U.S. 226 (1922); *Palmer v. Texas*, 212 U.S. 118 (1909); *Wabash R.R. Co. v. Adelbert Coll.*, 208 U.S. 38 (1908); *Farmers' Loan & Trust Co. v. Lake St. Elevated R.R. Co.*, 177 U.S. 51 (1900); *Moran v. Sturges*, 154 U.S. 256 (1894); *Byers v. McAuley*, 149 U.S. 608 (1893); *Porter v. Sabin*, 149 U.S. 473 (1893); *Rio Grande Ry. Co. v. Vinet*, 132 U.S. 478 (1889); *Borer v. Chapman*, 119 U.S. 587, 600 (1887); *Heidritter v. Elizabeth Oil-Cloth Co.*, 112 U.S. 294 (1884); *Krippendorf v. Hyde*, 110 U.S. 276 (1884); *Ellis v. Davis*, 109 U.S. 485 (1883); *Yonley v. Lavender*, 88 U.S. (21 Wall.) 276 (1874); *Buck v. Colbath*, 70 U.S. (3 Wall.) 334 (1865); *Freeman v. Howe*, 65 U.S. (24 How.) 450 (1860); *Taylor v. Carryl*, 61 U.S. (20 How.) 583 (1857): *Orton v. Smith*, 59 U.S. (18 How.) 263 (1855); *Peale v. Phipps*, 55 U.S. (14 How.) 368 (1852); *Williams v. Benedict*, 49 U.S. (8 How.) 107 (1850); and *Peck v. Jenness*, 48 U.S. (7 How.) 612 (1849). 13F Charles Alan Wright et al., *Federal Practice & Procedure* § 3631, at 271 n.15 (3d ed. 2009).

No. 09-30869

(24 How.) 450, 459 (1860); *Buck v. Colbath*, 70 U.S. (3 Wall.) 334, 341 (1865); *Farmers' Loan & Trust Co. v. Lake Street Elevated R.R. Co.*, 177 U.S. 51, 61 (1900), and to protect the judicial processes of the court first assuming jurisdiction, *Wabash R.R. Co. v. Adelbert Coll.*, 208 U.S. 38, 54 (1908); *Palmer v. Texas*, 212 U.S. 118, 129, 130 (1909), the principle, applicable to both federal and state courts, is established that the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other.").

The basis of the doctrine in considerations of judicial comity and federalism was explained by the Supreme Court over one hundred years ago in *Palmer v. Texas*, 212 U.S. 118, 125 (1909):

> The Federal and state courts exercise jurisdiction within the same territory, derived from and controlled by separate and distinct authority, and are therefore required, upon every principle of justice and propriety, to respect the jurisdiction once acquired over property by a court of the other sovereignty. If a court of competent jurisdiction, Federal or state, has taken possession of property, or by its procedure has obtained jurisdiction over the same, such property is withdrawn from the jurisdiction of the courts of the other authority as effectually as if the property had been entirely removed to the territory of another sovereignty.

"The origin of the rule, however, predates our dual federal-state court system, and its primary purpose is to protect the jurisdiction of the court that has acquired control over the property." 13F Wright et al., *supra*, at 278-79.

> It is settled that where a federal court has first acquired jurisdiction of the subject-matter of a cause, it may enjoin the parties from proceeding in a state court of concurrent jurisdiction where the effect of the action would be to defeat or impair the jurisdiction of the federal court. Where the action is in rem the effect is to draw to the federal court the possession or control, actual or potential, of the

26

No. 09-30869

> res, and the exercise by the state court of jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached. The converse of the rule is equally true, that where the jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same res to defeat or impair the state court's jurisdiction.

*Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922).

As a result, the Wright and Miller treatise is able to cite ample authority demonstrating that the doctrine has been applied equally to suits brought by the United States and private parties. It highlights that *Bank of New York & Trust Co.*, 296 U.S. 463, held that "[t]he United States, as a plaintiff, must follow the general rule that the court first acquiring jurisdiction of a res acquires exclusive jurisdiction [over] the res." 13F Wright et al., *supra*, § 3631, at 277 n.20. In addition, the treatise cites *United States v. One 1985 Cadillac Seville*, 866 F.2d 1142 (9th Cir. 1989); *United States v. Certified Industries, Inc.*, 361 F.2d 857 (2d Cir. 1966); *Pridgen v. Andresen*, 891 F. Supp. 733 (D. Conn. 1995); and *United States v. Augspurger*, 452 F. Supp. 659 (W.D.N.Y. 1978), *amended*, 477 F. Supp. 94 (W.D.N.Y. 1979), as further support. 13F Wright et al., *supra*, § 3631, at 277 n.20. Therefore, substantial controlling authority establishes that possibly always, and certainly in every case except where the United States seeks to defend its pre-existing property rights, federal courts lack authority to proceed with in rem proceedings if there is a prior initiated state court in rem proceeding involving the same subject matter property.

## III.

It is undisputed that both this federal condemnation suit and the state court inverse condemnation action are in rem proceedings. In the absence of explicit Louisiana case law or commentary to that effect regarding inverse

27

No. 09-30869

condemnation suits, however, I will set forth my reasons for so concluding. After that, I will discuss further why my colleagues in the majority have fallen into serious error in failing to adhere to the prior exclusive jurisdiction doctrine in this case and how this decision stems from their misinterpretation of *Leiter Minerals.* I will also demonstrate how their holding creates undesirable precedent, rests on faulty factual and legal support, and splits us from the Second Circuit.

**A.**

Federal and Louisiana courts have expressly recognized that condemnation suits brought by federal, state and local governments to take private property for public purposes are in rem proceedings. *See United States v. Carmack*, 329 U.S. 230, 235 n.2 (1946) ("The proceeding to condemn the land being in rem . . . ." (citing *United States v. Dunnington*, 146 U.S. 338, 352 (1892); and *In re Condemnation Suits by the United States*, 234 F. 443, 445 (E.D. Tenn. 1916))); *United States v. Petty Motor Co.*, 327 U.S. 372, 376 (1946) ("Condemnation proceedings are in rem . . . ." (citing *A.W. Duckett & Co. v. United States,* 266 U.S. 149 (1924); and *Dunnington*, 146 U.S. at 350-54)); *A.W. Duckett & Co.*, 266 U.S. at 151 ("[I]t seems to us manifest that the United States, although not taking the fee, proceeded in rem as in eminent domain, and assumed to itself by paramount authority and power the possession and control of the piers named, against all the world."); *Eagle Lake Improvement Co. v. United States*, 160 F.2d 182, 184 (5th Cir. 1947) ("A condemnation proceeding is an action in rem. It is not the taking of rights of designated persons, but the taking of the property itself." (citing *A.W. Duckett & Co.*, 266 U.S. at 151)); *New Orleans Redevelopment Auth. v. Lucas*, 881 So. 2d 1246, 1255 (La. Ct. App. 4th

Cir. 2004); *State Through Dep't of Highways v. Boudreaux*, 401 So. 2d 428, 430 (La. Ct. App. 1st Cir. 1981) ("An expropriation is in the nature of an in rem proceeding." (citing *Garber v. Phillips Petroleum Co.*, 146 So. 2d 518 (La. Ct. App. 3d Cir. 1963))); *Garber*, 146 So. 2d at 521 ("A condemnation proceeding is a proceeding in rem. It is not a taking of rights of persons in the ordinary sense but an appropriation of the land or property itself. When the property is conveyed by judgment, all previous existing estates or interests in the land are extinguished." (citing *A.W. Duckett & Co.*, 266 U.S. 149; *Dunnington*, 146 U.S. 338; and *United States v. Certain Lands in Borough of Brooklyn*, 129 F.2d 577 (2d Cir. 1942))); *State Through Dep't of Highways v. Walker*, 129 So. 2d 35, 37 (La. Ct. App. 2d Cir. 1961) ("Condemnation proceedings are in rem . . . .").

Although I have not found cases explicitly declaring that inverse condemnation suits are in rem proceedings, I conclude that they should be so considered because the United States Supreme Court and Louisiana's highest court have held that they are substantially equivalent to condemnation actions and essential to the self-executing constitutional protection of private property owners from governmental takings without just compensation. "In addition to . . . three statutory methods, the United States is capable of acquiring privately owned land summarily, by physically entering into possession and ousting the owner." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5 (1984) (citing *United States v. Dickinson,* 331 U.S. 745, 747-49 (1947)). "In such a case, the owner has a right to bring an 'inverse condemnation' suit to recover the value of the land on the date of the intrusion by the Government." *Id.* (citing *United States v. Dow*, 357 U.S. 17, 21-22 (1958)). "Such a suit is 'inverse' because it is brought by the affected owner, not by the condemnor." *Id.* at 5 n.6 (citing *United*

*States v. Clarke*, 445 U.S. 253, 257 (1980)). "The owner's right to bring such a suit derives from 'the self-executing character of the constitutional provision with respect to condemnation.'" *Id.* (quoting *Clarke*, 445 U.S. at 257, in turn quoting 6 P Nichols, *Eminent Domain* § 25.41 (rev. 3d ed. 1972)). As the Supreme Court stated in *First English Evangelical Lutheran Church of Glendale v. Los Angeles*, "[t]he fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the Amendment. *The suits were thus founded upon the Constitution of the United States*." 482 U.S. 304, 315 (1987) (quoting *Jacobs v. United States*, 290 U.S. 13, 16 (1933)) (internal quotation marks omitted).

Similarly, the Louisiana Supreme Court has held that an "action for inverse condemnation arises out of the self-executing nature of" the state constitutional requirement that "the expropriating entity is bound to make reparations," and the action requires the state to compensate private landowners for their property taken or damaged for public purposes even when the state has not initiated statutorily authorized expropriation proceedings. *State Through Dep't of Transp. & Dev. v. Chambers Inv. Co.*, 595 So. 2d 598, 602 (La. 1992); *see also Avenal v. State*, 886 So. 2d 1085, 1104 (La. 2004) ("Inverse condemnation claims derive from the Takings Clauses contained in both the Fifth Amendment of the U.S. Constitution and Art. I, § 4 of the Louisiana Constitution."); *Constance v. State Through Dep't of Transp. & Dev., Office of Highways*, 626 So. 2d 1151 (La. 1993); *St. Tammany Parish Hosp. Serv. Dist. No. 2 v. Schneider*,

808 So. 2d 576, 582 (La. Ct. App. 1st Cir. 2001) ("[T]he Louisiana Supreme Court has recognized that the action for 'inverse condemnation' arises out of the self-executing nature of the constitutional command to pay just compensation."). Further, the Louisiana Supreme Court held that the "aim of Article I, § 4, of [the Louisiana] [C]onstitution [of 1974] in requiring that the owner shall be compensated for property 'taken or damaged . . . to the full extent of his loss' . . . was deliberate, prompted by a belief on the part of the sponsors that inadequate awards had been provided under the prior law." *Chambers Inv. Co.*, 595 So. 2d at 602 (first omission in original) (citing L. Hargrave, *The Declaration of Rights of the Louisiana Constitution of 1974*, 35 La. L. Rev. 1, 15 (1974); and citing as "*cf.*" *State v. Dietrich*, 555 So. 2d 1355, 1358-59 (La. 1990); and *State Through Dep't of Highways v. Constant*, 369 So. 2d 699, 702 (La. 1979) as indicating that "the purpose of the additional language in Article I, § 4 was to compensate an owner for any loss sustained by reason of the taking, and not merely restricted as under the former constitution to the market value of the property taken and to reduction in the market value of the remainder"); *see also Avenal*, 886 So. 2d at 1103 n.23 (citing *Chambers Inv. Co.*, 595 So. 2d at 602 for this same proposition).

For these reasons, I conclude that the inverse condemnation action arising out of the self-executing nature of the United States and Louisiana Constitutions affords Sid-Mar's the same protection to the full extent of their loss as would be provided them in a statutory condemnation action brought by the state or any governmental entity in an in rem proceeding. Functionally, an action in rem is "[a]n action determining the title to property and the rights of the parties not merely among themselves, but also against all persons at any time claiming an

31

No. 09-30869

interest in that property; a real action." *Black's Law Dictionary* 32 (8th ed. 2004). Sid-Mar's alleged in their state inverse condemnation suit that they held a valid title to the 0.166-acre parcel at issue in the instant federal suit (which was part of the 10.2 acres commandeered by the state) against all persons claiming an interest in that property when the Governor of Louisiana commandeered the property by physically taking it and ousting them from possession and access to the land. Accordingly, I conclude that Sid-Mar's commenced a valid inverse condemnation action in rem in the state court prior to the United States' filing of the federal condemnation suit against the same property in rem in the present case. Therefore, the federal courts must respect the previously filed state court in rem proceedings as establishing that court's exclusive jurisdiction to adjudicate the title to the property taken and the compensation to be paid by the state in connection with the taking.[4] Additionally, the Louisiana Governor's commandeering order reserved to the owners of the land taken "all such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired." This reservation necessarily contemplates that a state court with in rem jurisdiction and possession and control of the property will determine the nature and the

---

[4] The Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. Rev. Stat. Ann. § 29:721 *et seq.*, empowers the Governor, subject to any applicable requirements for compensation, to "commandeer or utilize any private property if he finds it necessary to cope with a disaster or emergency." La. Rev. Stat. Ann. § 29:724(D)(4). The Act provides that the amount of compensation for such a loss "shall be calculated in the same manner as compensation due for the taking of property pursuant to the condemnation laws of [Louisiana]." La. Rev. Stat. Ann. § 29:730(G). The Act does not, however, establish or refer to any particular statutory method or procedure to govern the compensation of persons whose property is taken or condemned under the Governor's emergency commandeering power. Accordingly, Sid-Mar's inverse condemnation action is an in rem action based on the self-executing nature of the state and federal constitutions.

32

No. 09-30869

extent, if any, of the landowners' future right to use the property commandeered and taken from them.

**B.**

Contrary to the majority's and district court's conclusions, I also conclude that this case is neither analogous to nor controlled by *Leiter Minerals, Inc. v. United States*, 352 U.S. 220 (1957), and therefore the prior exclusive jurisdiction doctrine applies to and demands dismissal or a stay of this later filed federal in rem condemnation action in light of the earlier filed state in rem inverse condemnation action.

In *Leiter Minerals*, the Supreme Court first decided that the Anti-Injunction Act, 28 U.S.C. § 2283, does not apply to bar injunctions or stays sought by the United States because "statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect." 352 U.S. at 224 (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 272 (1947)) (internal quotation marks omitted). But the Court then stated that "[t]he question still remains whether the granting of an injunction was proper under the circumstances of that case." *Id.* at 226. The Supreme Court went on to give qualified approval of the district court's injunction of the state court proceedings in *Leiter Minerals*, *id.* at 226-28, but the Court distinguished the situation in *Leiter Minerals* from the "*more unusual situation where the United States, like any private claimant, made a claim against funds that it never possessed* and that were in the hands of depositaries appointed by the state court. In [*Leiter Minerals*], a private party is seeking by a state proceeding to obtain property *currently in the hands of persons holding under the United States*; the United States is seeking to *protect*

33

that possession and *quiet title* by a federal court proceeding," *id.* at 227-28 (emphasis added). Put another way, as the majority recognizes, *Leiter Minerals* did not directly analyze the prior exclusive jurisdiction doctrine or its implications. Majority Op. 7-8. However, it did allude to the doctrine through distinguishing *Bank of New York & Trust Co.*, which, as discussed *supra*, applied the doctrine against a later initiated in rem action brought by the United States. When its tangential consideration of the doctrine is understood in this manner, it becomes clear that *Leiter Minerals* did not fundamentally alter or amend the prior exclusive jurisdiction doctrine, but rather, at most, recognized a narrow exception where the sovereign, who is only required to litigate in the courts of its choosing, was seeking defensively to "protect" and "quiet" title it already possessed.

An enhanced recounting of *Leiter Minerals*' facts and legal analysis, drawn from the district court's opinion, helps to contrast its situation from other cases, such as this one, in which the prior exclusive jurisdiction doctrine applies. "On December 21, 1938, the United States acquired [by cash sale] from Thomas Leiter a tract of land comprising more than 8,000 acres" in Louisiana, reserving "mineral rights in the land to the vendor, with a stipulation that, with certain exceptions," the rights "would expire on April 1, 1945." *United States v. Leiter Minerals, Inc.*, 127 F. Supp. 439, 440 (E.D. La. 1954). Leiter Minerals, Inc. claimed "to have succeeded Thomas Leiter in title to the reserved mineral interest." *Id.* On March 1, 1949, the United States executed several mineral leases to Frank and Allen Lobrano, who conveyed operating rights under the leases to the California Company, which drilled eighty producing wells on the property. *Id.* Subsequently, the United States received royalty therefrom in

excess of $3.5 million. *Id*. Thus, any interruption in the operation of the wells would have caused the United States irreparable damage. *Id*. Also, "[s]ince the date of its acquisition, the United States ha[d] . . . maintained and administered the lands acquired from Thomas Leiter as part of a wild life refuge, thus retaining physical possession of the surface of the land . . . [and] the mineral rights by virtue of the mineral operations conducted by its lessees." *Id*. Leiter Minerals filed suit in state court in Louisiana against the California Company and Allen Lobrano as mineral lessees from the United States and prayed that Leiter Minerals be recognized as the lawful owner of all mineral rights under the land acquired by the United States from Thomas Leiter. *Id*. at 440-41; *see also Leiter Minerals*, 352 U.S. at 221 (stating that Leiter Minerals "founded its claim on Louisiana Act No. 315 of 1940, La. Rev. Stat. § 9:5806 (1950), which, it alleged, made 'imprescriptible' a reservation of mineral rights in a deed of December 21, 1938, to the United States by its predecessor in title"). The United States brought suit in the federal district court for the Eastern District of Louisiana to quiet its title to the mineral rights and for a preliminary injunction to restrain Leiter Minerals from prosecuting its state court action. *Leiter Minerals*, 127 F. Supp. at 441. "It s[ought] equitable relief in the form of an action to quiet title and to remove clouds on the title of the United States. A federal court has jurisdiction to grant such relief." *Id*. The district court held that, since the United States was not and could not be made a party to the state court suit, the title of the United States could be tried only in the federal court action, and that an injunction against prosecution of the state proceedings should issue to protect its jurisdiction pending determination of the ownership of the property. *Id*. at 443-46. The Court of Appeals affirmed, holding that the

No. 09-30869

preliminary injunction was proper because "the district court under the clear provisions of the statute, 28 U.S.C. § 1345, became vested with exclusive jurisdiction to determine the title of the United States to the mineral rights claimed by appellant." *Leiter Minerals, Inc. v. United States*, 224 F.2d 381, 383-84 (5th Cir. 1955).

Subject to one modification,[5] the Supreme Court affirmed the judgment of the Court of Appeals upholding the district court's injunction of the state court proceedings and allowing the United States' suit to quiet title to its property to proceed in the federal district court. The Court based its conclusions on principles more fully elaborated upon in the district court opinion: The United States as "sovereign cannot be sued in its own courts, or in any other, without its consent and permission." *Leiter Minerals*, 127 F. Supp. at 442 (quoting *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529 (1857)) (internal quotation marks omitted). "Officers or agents of the United States may be sued, however, for possession of property held by them in behalf of the United States." *Id.* (citing *Land v. Dollar*, 330 U.S. 731 (1947); *United States v. Lee*, 106 U.S. 196 (1882)). "Such an action is not one against the United States and, of course, would not be res judicata as against the United States." *Id.* (citing *Dollar*, 330 U.S. 731; *Lee,* 106 U.S. 196). Therefore, "[w]here a suit is brought in a state or federal court *against* officers or agents of the United States *claiming property held by those officers for the United States*, the United States may bring its own action in a state or federal court asking the court to adjudicate its claim to title to the

---

[5] To avoid the possibility that the district court would unnecessarily reach and decide a federal constitutional question, the Supreme Court "modif[ied] the judgment of the Court of Appeals to permit an interpretation of the state statute to be sought with every expedition in the state court in conformity with this opinion." *Leiter Minerals*, 352 U.S. at 230.

property involved in the former suit and is entitled to an injunction staying further proceedings therein." *Id.* (emphasis added).[6] In other words, "since the United States cannot be made a *defendant* to a suit concerning *its property*, and no judgment in any suit against an individual who has possession or control of such property can bind or conclude the government, . . . the government is always at liberty, notwithstanding any such judgment, to avail itself of all the remedies which the law allows to every person, natural or artificial, for the vindication and assertion of its rights," which, because of sovereign immunity, must occur in federal court. *Id.* at 443 (emphasis added) (quoting *Lee*, 106 U.S. at 222) (internal quotation marks omitted). Therefore, an injunction was proper in the circumstances presented in *Leiter Minerals* because the United States came into federal court in a defensive position, seeking to protect and quiet title to an existing property right that was being litigated against its agents in state court. *Id.* at 444.

By contrast, the district court continued, an injunction would not have been proper, were the circumstances present in *Leiter Minerals* like those at issue in *United States v. Bank of New York & Trust Co.*, 296 U.S. 463 (1936). *Leiter Minerals*, 127 F. Supp. at 444. "In [*Bank of New York & Trust Co.*] the Supreme Court held that the federal court did not have exclusive jurisdiction of

---

[6] The court cited the following as support for this proposition: *Land v. Dollar*, 341 U.S. 737 (1951); *Dollar,* 330 U.S. 731; *Lee*, 106 U.S. 196; *United States v. Dollar*, 196 F.2d 551 (9th Cir. 1952); *United States v. Dollar*, 193 F.2d 114 (9th Cir. 1952); *Dollar v. United States*, 190 F.2d 547 (9th Cir. 1951); *Brown v. Wright*, 137 F.2d 484 (4th Cir. 1943); *United States v. McIntosh*, 57 F.2d 573 (4th Cir. 1932); *United States v. Dollar*, 100 F. Supp. 881 (N.D. Cal. 1951); *United States v. Dollar*, 97 F. Supp. 50 (N.D. Cal. 1951); *United States v. Taylor's Oak Ridge Corp.*, 89 F. Supp. 28 (E.D. Tenn. 1950); *United States v. Cain*, 72 F. Supp. 897 (W.D. Mich. 1947); *United States v. Babcock*, 6 F.2d 160 (D. Ind. 1925); and *United States v. Inaba*, 291 F. 416 (E.D. Wash. 1923).

the claim of the United States to certain funds of three Russian insurance companies dissolved by the Soviet government in 1918, which funds were in the custody of the state court in New York in connection with proceedings in that court liquidating the insurance companies. The funds were being held subject to appropriate orders of the court providing for their distribution to creditors, policyholders, and other claimants, in accordance with the state insurance laws. The Soviet government claimed ownership of these funds and assigned its claim to the United States, which filed suit in 1933, eight years after the state liquidation proceedings began, in the United States District Court for the Southern District of New York, and sought to enjoin further proceedings concerning the funds in the state court. The judgment of the federal district court, dismissing the complaint and denying a motion for injunction, was affirmed by the Supreme Court on the ground that the state court had first assumed jurisdiction and control of the funds, and that such control was essential to give effect to that court's jurisdiction to protect the rights of claimants in the state court proceeding, none of whom was before the federal court." *Id*. at 444-45. Thus, the *Leiter Minerals* district court emphasized that were the United States entering federal court *offensively*, seeking to secure possession of a property right through an in rem proceeding, and there was a prior initiated in rem state court proceeding involving the same property, the prior exclusive jurisdiction doctrine would apply and require the federal court to stay or dismiss its case in deference to the prior in rem state court action.

Albeit with not as much clarity or detail as the district court, the Supreme Court affirmed on the same basis: that the circumstances presented in *Leiter Minerals* warranting an injunction were narrow: An injunction was only proper

38

No. 09-30869

because the United States had invoked the federal court's jurisdiction defensively, being forced to quiet its *existing* title that had been put at issue in a state court suit brought against its lessors. The Court explained that the injunction was proper because "the federal court was the only one that could finally determine the basic issue in the litigation—whether the title of the United States to the mineral rights was affected by Louisiana Act No. 315 of 1940. The United States was not a party to the state suit and, under settled principles, title to land *in possession* of the United States under a claim of interest cannot be tried as against the United States by a suit against persons holding under the authority of the United States." *Leiter Minerals*, 352 U.S. at 226 (emphasis added) (citing *Lee*, 106 U.S. 196).

The Supreme Court also distinguished, rather than overruled, *Bank of New York & Trust Co.*, 296 U.S. 463, upon which Leiter Minerals continued to rely, stating: "the *Bank of New York* case presented the more unusual situation where the United States, like any private claimant, *made a claim against* funds that it *never possessed* and that were in the hands of depositaries appointed by the state court. In [*Leiter Minerals*], a private party is seeking by a state proceeding to obtain property *currently* in the hands of persons holding under the United States; the United States is seeking to protect that possession and quiet title by a federal court proceeding. Therefore, since the position of the United States is *essentially a defensive one*, we think that it should be permitted to choose the forum in this case . . . ." *Leiter Minerals*, 352 U.S. at 227-28 (emphasis added). Thus, the Court affirmed the district court's analysis that were the United States to have entered federal court offensively, seeking to secure a right it did not posses through an in rem proceeding, and were there a

No. 09-30869

prior initiated in rem state court proceeding involving the same property, the prior exclusive jurisdiction doctrine would prevent the federal district court from issuing an injunction against the state court proceedings.[7]

Lest there be any doubt as to this reading of *Leiter Minerals*, it has been supported and adhered to consistently by subsequent Supreme Court and circuit cases. In *Colorado River Water Conservation District v. United States*, the Court reaffirmed the continued validity of the prior exclusive jurisdiction rule—including when the United States initiates the later federal in rem action—by explaining, "It has been held, for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts." 424 U.S. 800, 818 (1976) (citing *Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964); *Princess Lida,* 305 U.S. at 466; *Bank of N.Y. & Trust Co.*, 296 U.S. at 477). The Court continued that "[t]his has been true even where the Government was a claimant in existing state proceedings and then sought to invoke district-court jurisdiction." *Id.* (citing *Bank of N.Y. & Trust Co.*, 296 U.S. at 479). The Court acknowledged the *Leiter Minerals* precedent,

---

[7] Further demonstrating that *Leiter Minerals* did not meaningfully, if at all, alter or amend the long-established prior exclusive jurisdiction doctrine, the *Leiter Minerals*' district court explained that it was an open question whether the state suit being enjoined in that case was in fact an in rem action. It explained that one of the "many and obvious" distinctions between *Leiter Minerals* and *Bank of New York & Trust Co.*, is that "[t]here is no case . . . from the Supreme Court which holds that the mere filing of a suit claiming ownership of property places that property under the control of the court so that no other court has the right to adjudicate claims against that property. In fact, the decisions seem to be to the contrary." *Leiter Minerals*, 127 F. Supp. at 446 (citing *Markham v. Allen*, 326 U.S. 490 (1946); *Mandeville*, 318 U.S. 47; *Commonwealth Trust Co. v. Bradford*, 297 U.S. 613 (1936)). Although the Supreme Court later acknowledged that "the state litigation has the elements of an action characterized as quasi in rem," it declined to call into question the district court's insinuation that the prior exclusive jurisdiction doctrine might not be implicated at all because the state court proceedings were not truly in rem or quasi in rem. *Leiter Minerals*, 352 U.S. at 228.

40

but only through a citation, "but cf." In this manner, the Court indicated that *Leiter Minerals* could be read as a narrow exception to its broad statement that the prior exclusive jurisdiction doctrine applies "even where the Government was a claimant." Nonetheless, the Court's cursory treatment of the precedent clearly indicated that it understood *Leiter Minerals* to provide, at most, an unremarkable and very narrow exception to the general rules articulated in *Colorado River Water Conservation District.*

More recently and directly, the Tenth Circuit in *United States v. Buck* described *Leiter Minerals* as standing *solely* for the narrow proposition described above, that a federal court may enjoin a "state court proceeding[] . . . to protect jurisdiction of [the] federal court in [a] quiet title action brought by [the] United States." 281 F.3d 1336, 1344 (10th Cir. 2002).

The situation here, involving Sid-Mar's prior state court inverse condemnation in rem action vis-a-vis the subsequently filed United States' federal court condemnation in rem action, is markedly different from that in *Leiter Minerals.* Sid-Mar's state suit does not challenge the title to land or minerals held by a lessee who obtained rights in the property from the United States. The United States' federal suit is not an action to quiet its pre-existing title or claim of interest to land or minerals or to remove a cloud on its title created by Sid-Mar's. Instead, the United States is seeking to condemn land in which it previously did not have a title or a claim of interest. In this manner, the present situation is more similar to the situation in *United States v. Bank of New York & Trust Co.*, where the United States, like any private claimant, made a claim against funds that it did not possess or that were not in the hands of persons holding under the United States' title. Therefore, assuming arguendo

No. 09-30869

that *Leiter Minerals* intended to speak to and amend the prior exclusive jurisdiction doctrine, it did not do so in a manner that would keep the doctrine from applying to the facts of this case; as in *Bank of New York & Trust Co.*, the rule that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other applies to the present case. Accordingly, the state court in Sid-Mar's inverse condemnation action should be allowed to maintain its jurisdiction to adjudicate title and compensation with respect to the 0.166 acres commandeered and taken by the State of Louisiana, to the exclusion of the federal district court's jurisdiction to adjudicate the United States' condemnation of the same property. Once that state court litigation is complete, there would be no barrier the United States filing its condemnation action in federal district court.

## C.

The facts and analysis in *Leiter Minerals* underscored that it created a narrow exception, if any, to the prior exclusive jurisdiction doctrine: That when the United States, which is only required to litigate in the courts of its choosing, is seeking *defensively* to "protect" and "quiet" title *it already possesses*, it can obtain an injunction against a prior initiated state court in rem proceeding concerning the same property. The majority, however, reads this narrow exception expansively, as providing federal district courts with the power to enjoin prior initiated state court in rem suits any time the United States conceives of a "future interest" it might have in the res. Majority Op. 17. Momentarily recognizing the unacceptable implications of such a rule, the majority attempts to characterize the United States' "future interest" in this case as concrete: "[I]t is possible the United States has a claim to the land that

42

preceded the commencement of the state court lawsuit. . . . [T]he [state] Executive Order that acted to commandeer the property referred specifically to the Cooperation Agreement between the United States and the Orleans Levee District . . . . That Cooperation Agreement . . . indicated the federal government would later acquire full ownership rights in the property." Majority Op. 17. Yet this mischaracterizes the Cooperation Agreements, of which there are actually three: the original agreement and two supplements. The Cooperation Agreements between the U.S. Department of the Army and the Orleans Levee District, among other local entities, do not purport to grant the United States any interest in the parcel of land that the Governor of Louisiana commandeered from Sid-Mar's nor do they obligate the Governor nor the State of Louisiana to transfer property to the Department. The Agreement merely obligates the Orleans Levee District, and the other named local entities, to try to acquire necessary land and right-of-ways, both of which are described by their general location and not by legal descriptions; and it states that if that strategy fails, the United States can obtain such an interest "through the exercise of eminent domain authority" *if* there existed sufficient appropriations. That is, at the time the United States signed the Cooperation Agreements, its interest in the property subject to the Agreements was no more of a legal interest than it might have in any property in the nation: If the Levee District's strategy outlined in the Cooperation Agreements failed, and the United States determined that it was appropriate and desirable for it to exercise its power of eminent domain, and funds were available, it intended to do so. Consistent with this, the United States never alleged nor argued as part of this federal suit that it had an *existing* interest in Sid-Mar's property when Sid-Mar's state suit was filed. To the

43

contrary, in its brief in the district court arguing for a stay, the United States acknowledged that this case was distinguishable from *Leiter Minerals* because it was not filing "a quiet title action in the instant case." As a result, the majority's rule is as broad and unwieldy as it appears. It undermines the principles of federalism that the prior exclusive jurisdiction doctrine was designed to protect. Not surprisingly then, the case law that the majority cites in support of its holding stands for no such principle and, in fact, the majority splits us from the Second Circuit.

As I described above, the prior exclusive jurisdiction doctrine is designed to defend and respect our national system of dual sovereignty. "The Federal and state courts exercise jurisdiction within the same territory, derived from and controlled by separate and distinct authority, and are therefore required, upon every principle of justice and propriety, to respect the jurisdiction once acquired over property by a court of the other sovereignty." *Palmer v. Texas*, 212 U.S. 118, 125 (1909). Accordingly, the prior exclusive jurisdiction doctrine was designed to force courts' "circumspection in undertaking any action that might result in the interference with a res in the custody of another court, which thereby might violate the autonomy of the state and federal judicial systems." 13F Wright et al., *supra*, at 278.

By holding that the prior exclusive jurisdiction doctrine does not apply whenever the United States has a conceived "future interest" in the res, the majority provides the federal district courts with largely unfettered discretion to debase previously filed state court proceedings. According to the majority, because the United States *could* exercise its power of eminent domain over property, that is a sufficient federal interest to empower the district courts proceeding in rem to reach into the state courts and strip them of their existing

jurisdiction over property under their control. Although the United States has no direct interest at stake in the state court suit and it will suffer no impairment of any pre-existing property right or its right to choose its forum in which to establish such rights, the majority allows federal courts to stay state court proceedings and potentially circumvent the state courts in the name of a federal interest. The majority allows for such an outcome even though these are precisely the circumstances in which the Supreme Court has stated that our interests in federalism are at their highest and thus the prior exclusive jurisdiction doctrine should be fully enforced. *See Bank of N.Y. & Trust Co.*, 296 U.S. at 480-81 (stating that the prior exclusive jurisdiction doctrine prevented the federal court's from assuming jurisdiction over the res in a suit brought by the United States because "[t]here is no merit in the suggestion that the United States, in presenting its claim in the state proceedings, would be compelled to take the position of a defendant—being sued without its consent" and "[w]e cannot see that there would be impairment of any rights the United States may possess").

The majority cites *Alonzo v. United States*, 249 F.2d 189 (10th Cir. 1957), as supporting its holding that the United States' "future interest" in the res is a sufficient basis for a federal court to enjoin a prior initiated state court in rem proceeding; but that case establishes no such rule. There, the Tenth Circuit held that because the United States had an *existing* interest in property subject to a state court suit, "as clear as it would be if the fee were in the United States," a federal district court could enjoin the state proceeding, allowing the United States to litigate in federal court. *Id.* at 197. In *Alonzo*, Lupe, Jim, Joe and Valentino Alonzo and James Garcia filed suit in a New Mexico court seeking to eject the Pueblo Indian tribe from "certain lands described in their complaint .

. . and damages for minerals alleged to have been wrongfully extracted from said lands." *Id.* at 190. The United States then entered federal court "in its own behalf and in behalf of the Pueblo . . . seeking a judgment *quieting the title to* certain of the lands embraced in the state court action and enjoining the plaintiffs in the state court action from prosecuting such action." *Id.* (emphasis added). The district court issued a preliminary injunction against the state court plaintiffs preventing them from prosecuting their state court suit and they appealed.

The Tenth Circuit upheld the injunction, citing *Leiter Minerals*. *Id.* at 196-97. It reviewed the history of the Pueblo's ownership of the land and their relationship with the United States and concluded that although the Pueblo had many traditional aspects of ownership, "[r]estricted Indian land is property in which the United States has an interest. 'This national interest is not to be expressed in terms of property, or to be limited to the assertion of rights incident to the ownership of a reversion or to the holding of a technical title in trust.'" *Id.* at 197 (quoting *United States v. Hellard*, 322 U.S. 363, 366 (1944), in turn quoting *Heckman v. United States*, 224 U.S. 413, 437 (1912)) (internal quotation marks omitted). Therefore, "the Governmental interest in the instant action is as great as it would be if the fee to the lands involved were in the United States. Indeed, since the United States is suing as a guardian of a dependent nation in discharge of a fiduciary duty, its right and duty to protect the interests of its wards may be even greater then it would if it were suing in its own behalf with respect to its own lands." *Id.* It was in light of this relationship to and authority over the land—not, as the majority claims, the United States' "future interest in that property," Majority Op. 17—that the Tenth Circuit concluded, under *Leiter*

*Minerals,* that the United States could seek and obtain an injunction of the state court suit. *Alonzo*, 249 F.3d at 197 (citing *Leiter Minerals*, 352 U.S. 220).

Moreover, the majority's holding splits us from the Second Circuit. In *United States v. Certified Industries, Inc.*, 361 F.2d 857 (2d Cir. 1966), the Second Circuit considered essentially the same question presented by this case: whether *Leiter Minerals* amends the prior exclusive jurisdiction doctrine so that it does not apply to later initiated federal in rem proceedings brought by the United States. Consistent with my analysis, a unanimous panel of the Second Circuit held that *Leiter Minerals* was distinguishable and that the prior exclusive jurisdiction doctrine continued to apply to federal court actions brought by the United States except where the United States enters federal court defensively, seeking to protect and quiet its *pre-existing* title to property.

In the Second Circuit's case, Certified Industries, a construction subcontractor, sued in state court seeking to "foreclose a lien" for funds it was owed for work it had performed for Meteor, a contractor. *Id.* at 858-59. The United States sought to enjoin that state court suit "on the theory that it [was] entitled to have a trust imposed" on those same funds. *Id.* at 859. The district court granted the United States a preliminary injunction, but the Second Circuit reversed, stating that both the prior initiated state court suit and the federal suit were in rem. *Id.* at 859-60. The Second Circuit explained that *Leiter Minerals* did "not mean . . . that a stay is automatically granted simply on the application of the United States." *Id.* at 859. As recounted by the Second Circuit, while the Supreme Court in *Leiter Minerals* held that the Anti-Injunction Act did not bar injunctions of state court suits sought by the United States, the *Leiter Minerals* Court also "went on to say that it was also necessary to inquire

47

'whether the granting of an injunction was proper in the circumstances of this case.'" *Id.* (quoting *Leiter Minerals*, 352 U.S. at 226). Therefore, the Second Circuit held, consistent with my analysis and contrary to the conclusion of the majority, that in light of the prior exclusive jurisdiction doctrine, "[t]he United States is not entitled to an injunction staying state court proceedings where the state court is the first court to assume jurisdiction over the subject matter property of an action in rem or quasi in rem." *Id.* at 860 (citing *Bank of N.Y. & Trust Co.*, 296 U.S. at 447; *Penn Gen. Cas. Co.*, 294 U.S. at 195).

The Second Circuit acknowledged that *Leiter Minerals* may have carved out a narrow exception to the prior exclusive jurisdiction doctrine, but, for the same reasons that I believe that *Leiter Minerals* is distinguishable from the instant case, the Second Circuit explained that the exception did not apply to its case. *Id.* at 861. The Second Circuit reasoned: "The Supreme Court in [*Leiter Minerals*] indicated that where the United States' position is 'defensive' it should be able to choose its forum 'even though the state litigation has the elements of an action characterized as quasi in rem.'" *Id.* at 861 (quoting *Leiter Minerals*, 352 U.S. at 228). However, in *Certified Industries* the United States' position was not "defensive" because it was not seeking to protect or retain "funds or title to property *in its possession* at the commencement of the state proceeding." *Id.* (emphasis added). Therefore, analogizing the case to *Bank of New York & Trust Co.,* the Second Circuit concluded that the prior exclusive jurisdiction doctrine applied to bar the injunction sought by the United States. *Id.* at 861-62; *see also United States v. Akin*, 504 F.2d 115, 122 n.5 (10th Cir. 1974) (stating that the Supreme Court allowed the injunction in *Leiter Minerals* because "the United

No. 09-30869

States [was] seeking to protect [its] possession and quiet title by a federal court proceeding" (citing *Leiter Minerals*, 352 U.S. at 227-28)).

Just last year, the Second Circuit positively cited to *Certified Industries'* reading of *Leiter Minerals* and the prior exclusive jurisdiction doctrine in *Interworks Systems Inc. v. Merchant Financial Corp.*, 604 F.3d 692, 701 n.7 (2d Cir. 2010) (indicating that *Certified Industries'* analysis of when an "injunction against state court proceedings could issue" remained good law). This court too has positively cited *Certified Industries* for its articulation of the prior exclusive jurisdiction doctrine. *Signal Props., Inc. v. Farha*, 482 F.2d 1136, 1137 (5th Cir. 1973) (citing *Certified Indus.,* 361 F.2d 857).

## CONCLUSION

Therefore, I conclude that, consistent with the relevant Supreme Court and circuit authority and the views of the leading commentators, *Leiter Minerals* does not exempt in rem actions by the United States from the prior exclusive jurisdiction doctrine—except possibly where it is defensively seeking to quiet its pre-existing title to property—and because the United States in this case is proceeding offensively, not defensively, to acquire title to property for the first time in this federal action filed after Sid-Mar's commenced the in rem state court action involving the same parcel of land, the doctrine requires that the injunction of Sid-Mar's state court in rem action issued by the district court be withdrawn. Accordingly, I would vacate the district court's injunction and remand the case to it for dismissal, stay, or other proceedings consistent with this opinion. For these reasons, I respectfully dissent.